**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ROBERTA COMERFORD,

                                        Plaintiff,                    5:18-cv-01143 (BKS/TWD)

v.

VILLAGE OF NORTH SYRACUSE; NORTH
SYRACUSE POLICE DEPARTMENT, CHIEF
MICHAEL CROWELL; SGT. ANDREW
DEGIROLAMO; JEFFREY TRIPP; and JOHN & JANE
DOE(S).

                                        Defendants.

**Appearances:**

*For Plaintiff:*
A.J. Bosman
Bosman Law Firm, LLC
3000 McConnellsville Road
Blossvale, NY 13308

*For Defendants:*
Shannon T. O'Connor
John P. Coghlan
Goldberg Segalla, LLP
5786 Widewaters Parkway
Syracuse, NY 13214

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

        Plaintiff Roberta Comerford, a former Sergeant at the North Syracuse Police Department

("NSPD"), brings this employment discrimination action against Defendants Village of North

Syracuse (the "Village"), the NSPD, Chief Michael Crowell, Sgt. Andrew DeGirolamo, Jeffrey

Tripp, and John and Jane Does. (Dkt. No. 6). Plaintiff alleges Defendants subjected her to gender

discrimination, a hostile work environment, and retaliation, in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), *as amended*, 42 U.S.C. § 2000e *et seq*., the Equal Protection

Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, and the New York State Human Rights

Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., and retaliation, in violation of the First

Amendment, 42 U.S.C. § 1983. (Dkt. No. 6 (First–Eighth Causes of Action)). In addition,

Plaintiff alleges breach of contract, defamation, tortious interference with employment, and

violation of the New York State Constitution. (*Id.* (Ninth–Twelfth Causes of Action)). Presently

before the Court is Defendants' motion for summary judgment under Rule 56 of the Federal

Rules of Civil Procedure.[1] (Dkt. No. 65). The parties have fully briefed the motion. (Dkt. Nos.

71, 76). For the reasons that follow Defendants' motion is granted in part and denied in part.

## II.    FACTS[2]

### A.    NSPD Overview

Plaintiff was employed at the NSPD from January 2, 1998 through January 5, 2018 as a

police officer and a sergeant. (Dkt. No. 65-93, ¶ 4; Dkt. No. 71-7, ¶ 4). Defendant Michael

Crowell served as Chief of Police for the NSPD from 2012 to October 13, 2017. (Dkt. No. 65-20,

¶ 3). The NSPD employed between thirteen and sixteen police officers, (Dkt. No. 65-93, ¶ 14;

Dkt. No. 71-7, ¶ 14), two of which were female—Plaintiff and Ashley Smith, who worked part-

time. (Dkt. No. 65-93, ¶ 15; Dkt. No. 71-7, ¶ 15).

In 2006, Plaintiff was promoted to the rank of sergeant. (Dkt. No. 65-93, ¶ 5; Dkt. No.

71-7, ¶ 5). Plaintiff and Sergeant Shawn Stassi were the only two sergeants at the NSPD until

---

[1] In their motion, Defendants argue for dismissal of any potential claim for violation of constitutional due process. (Dkt. No. 65-94, at 38). The Complaint, however, does not contain a procedural due process claim nor does the Court construe it as raising a procedural due process claim.

[2] The facts have been drawn from Defendants' statement of material facts, (Dkt. No. 65-93), Plaintiff's response, (Dkt. No. 71-7), and Defendants' reply (Dkt. No. 76-1), as well as the attached exhibits, depositions, and declarations. The facts are taken in the light most favorable to Plaintiff.

Defendant Tripp was promoted to sergeant in April 2016. (Dkt. No. 71-2, ¶ 4; Dkt. No. 71-6, ¶ 1; Dkt. No. 65-85, ¶ 2). When she was sergeant, Plaintiff was the "most senior Sergeant at NSPD" and the "highest ranked NSPD officer below Chief Crowell." (Dkt. No. 71-2, ¶ 5).

### B.      Events from 2012 to 2015[3]

Plaintiff does not claim the following events constitute discrete acts of gender discrimination or retaliation for purposes of her present claims, which center on her demotion from sergeant to police officer in September 2016 and Chief Crowell's revocation of her certification as police officer in September 2017. (*See generally* Dkt. No. 71-8). Plaintiff relies on incidents occurring from 2013 to 2015 as background evidence and as evidence of a gender-based hostile work environment where she was subject to excessive scrutiny. Defendants, on the other hand, assert that her history of discipline supports Chief Crowell's decision to demote her. That history includes: discipline in 2013 for failing to safeguard a handgun, (Dkt. No. 65-93, ¶ 95; Dkt. No. 71-7, ¶ 95; Dkt. No. 65-34, at 2–6), a letter of reprimand in July 9, 2014, for a second accidental discharge of a taser in a seven-month period, (Dkt. No. 65-20, ¶ 101; Dkt. No. 65-41, at 2), four Quality Assurance Reports[4] from July 26, 2013 to July 29, 2014, finding the reports and documentation Plaintiff had prepared following several investigations and arrests "contained multiple errors," were "missing factual information" and failed "to properly charge individuals with the appropriate crimes." (Dkt. No. 65-20 ¶¶ 91, 93, 97–98, 103; Dkt. No. 65-38,

---

[3] The parties have submitted evidence regarding Plaintiff's employment at the NSPD prior to 2012, including various disciplinary records from 2005 to 2010 concerning Plaintiff. (Dkt. No. 65-20, ¶¶ 56–66). As these records predate Defendant Crowell's tenure as Chief, and there is, in any event, a gap of approximately three years between disciplinary records, (*see, e.g.*, *id.* ¶ 66 (December 8, 2010 counseling memorandum issued to Plaintiff by then-Chief Thomas Connelly); *id.* ¶ 83 (2013 discipline by Chief Crowell for failing to safeguard department-owned handgun)), the Court finds them immaterial.

[4] Quality Assurance Reports are a form of "[n]on-punitive discipline." (*Id.* ¶ 41).

at 2; Dkt. No. 65-37, at 2; Dkt. No. 65-43, at 2), counseling in August 2015 for issues with paperwork, (Dkt. No. 65-20, ¶ 113), and the following incidents.

### 1. Criticism by Chief Crowell – May 24, 2013 Harassment Complaint

On May 24, 2013, Plaintiff "responded to a harassment complaint where the victim complained the suspect went to her boyfriend's house in violation of a full stay away Protective Order." (Dkt. No. 65-93, ¶ 97). Plaintiff asserts that the "order of protection did not apply to [the victim's] boyfriend's residence," where she responded and though the suspect "had visited" the boyfriend's house, there "was no evidence to suggest that the female was present at that location." (Dkt. No. 71-2, ¶ 18). Plaintiff called the district attorney's office for advice on how to proceed and was advised that "there was no probable cause to make an arrest because the female did not live at the location and there was no evidence she was present there or the male attempted to contact her." (Dkt. No. 71-2, ¶ 19). Chief Crowell disputes this, stating that "[t]here was sufficient information that the suspect was aware that the victim was present at the location and refused to leave, which is a clear violation of a Protective Order." (Dkt. No. 65-20 ¶ 88). "Plaintiff did not arrest the suspect and cleared the complaint." (Dkt. No. 65-93, ¶ 98; Dkt. No. 71-7, ¶ 98). Chief Crowell found "Plaintiff's failure to arrest the suspect . . . was below the appropriate standard for an officer of her rank and experience" but does not appear to have issued any counseling or discipline in connection with this incident. (Dkt. No. 65-20, ¶ 89).

### 2. Charges of Incompetency and Notice of Discipline – Citizen Request to Take Possession of Handgun

On August 24, 2014, Plaintiff and a second NSPD police officer "responded to a residence . . . at the request of an individual," who wanted them "to take possession of a locked case [that was believed to contain a handgun and] that belonged to the owner of the house who was in his eighties and suffered from dementia." (Dkt. No. 71-2, ¶ 22). The individual "did not

have a key and was unsure what was inside the case," "was not the child of the owner," and "did not have a power of attorney from the owner." (*Id.*). Plaintiff and the officer spoke with the owner's son on the phone and he indicated that he "would like [them] to take possession of his father's handgun." (*Id.*). Plaintiff "did not believe [she] should take a locked case with unknown contents to the police department" and as the individual told them that there was no reason "the case needed to be immediately removed," she did not take possession at that time. (*Id.* ¶¶ 22–23).

On August 24, 2014, Chief Crowell filed charges of incompetency against Plaintiff "resulting from Plaintiff's failure to take possession of a handgun." (Dkt. No. 65-20, ¶ 104; Dkt. No. 65-44, at 2–4). On September 15, 2014, Chief Crowell issued Plaintiff a Notice of Discipline, (Dkt. No. 65-45, at 2), advising that she was the subject of a NSPD Internal Affairs investigation; it alleged that Plaintiff: (1) failed "to maintain sufficient competency based on position and rank"; (2) failed "to protect life and property"; (3) failed "to take appropriate action involving an incident"; (4) failed "to properly secure property discovered upon an investigation"; and (5) engaged in "[c]onduct which brings discredit to the agency." (Dkt. No. 65-45, at 2). After Chief Crowell completed his investigation he "sustained the allegations," and on October 27, 2014, served Plaintiff with a Notice and Statement of Charges. (Dkt. No. 65-20, ¶ 109; Dkt. No. 65-47, at 2–3). Plaintiff requested dismissal of the charges "or that the discipline proceed to the next level under the Collective Bargaining Agreement" ("CBA").[5] (Dkt. No. 65-93, ¶ 125; Dkt. No. 71-7, ¶ 125). "The Village sustained the charges against Plaintiff" and the Village and Plaintiff "reached a settlement agreement concerning these charges wherein the Village deducted 3 days of Plaintiff's time as a consequence for her actions." (Dkt. No. 65-3, ¶¶ 126–27; Dkt. No. 71-7, ¶ 126–27; Dkt. No. 65-48; Dkt. No. 65-49, at 2–3).

---

[5] The CBA was between Plaintiff's union, Teamsters Local 1149 and the Village. (Dkt. No. 71-1, at 52).

### C.   Events from 2016 to 2018

#### 1.   Counseling Memorandum – Domestic Violence Investigation

On March 7, 2016, Plaintiff responded to a domestic violence report. (Dkt. No. 65-93, ¶ 128; Dkt. No. 71-7, ¶ 128). She was "the highest ranking NSPD to respond." (Dkt. No. 71-2, ¶ 24). While looking for the suspect, Plaintiff located a male "running in the area of the residence we responded to," who "claimed to have run to" a nearby "gas station to buy cigarettes." (*Id.*). Plaintiff "went with the individual to the gas station to confirm his story." (*Id.*). Plaintiff "was coordinating with the Sheriff's Department helicopter that was assisting with the search" as well as a sergeant from the Sheriff's Department SWAT team. (*Id.*). According to Chief Crowell, who later arrived on the scene, "[t]he primary suspect of the investigation was at large and potentially armed" and "there was a belief the suspect may be within a house." (Dkt. No. 65-20, ¶¶ 115–16). Plaintiff states that while the suspect owned a gun, "there was no reason to believe he was a threat." (Dkt. No. 71-2, ¶ 24). Chief Crowell's "conversations with Plaintiff" and "observations on site" led him to conclude that Plaintiff was not "in control of the situation," and "did not have any plan to resolve the situation, which, as the highest ranking member of the NSPD on scene, was Plaintiff's responsibility." (Dkt. No. 65-20, ¶ 118). Chief Crowell asked an officer who had also been on the scene to submit a memorandum. (*Id.*; Dkt. No. 65-51, at 2–4).

On April 28, 2016, Chief Crowell issued a counseling memorandum to Plaintiff stating that it "seem[ed] apparent . . . that [Plaintiff] failed to take a leadership role," noting that one officer commented that she "displayed 'no command presence,'" and stating that it was "troubling" that Plaintiff "offered no plan of action. (Dkt. No. 65-52, at 2). Chief Crowell further wrote that it had come to his "attention that [Plaintiff's] leadership skills have become a troubling common occurrence." (*Id.*). Chief Crowell referred Plaintiff to a training article on

leadership and warned "that future performance of this nature will not be tolerated and may result in further disciplinary action." (*Id.*).

### 2. Scheduling Duties and "Administrative Sergeant" Position

Prior to June 2016, it had been Plaintiff and Sergeant Shawn Stassi's shared responsibility to maintain the NSPD schedule and schedule and approve NSPD employee leave requests. (Dkt. No. 65-93, ¶ 32–33; Dkt. No. 71-7, ¶ 32–33; Dkt. No. 71-2, ¶¶ 4, 6). Chief Crowell found that "[t]his arrangement resulted in confusion and inconsistent scheduling for the NSPD," and in June 2016, delegated "sole responsibility for creating the work schedule to one sergeant"—Sergeant Tripp. (Dkt. No. 65-93, ¶ 32–33; Dkt. No. 71-7, ¶ 32–33; Dkt. No. 65-20, ¶ 19; Dkt. No. 71-2, ¶ 6). The parties dispute whether, in doing so, Chief Crowell created a new position. According to Plaintiff, in an "early June 2016" "supervisor's meeting," Chief Crowell "told (then) Sergeant Stassi, Sergeant Tripp, and [Plaintiff] that he was creating an 'Administrative Sergeant' position," (Dkt. No. 71-2, ¶ 6), and that he was giving "this position to Defendant Tripp, at that time the Sergeant with the least seniority." (*Id.*). Chief Crowell acknowledges that he delegated this task to Sergeant Tripp but denies creating "a new 'Administrative Sergeant' position," and explains that "[t]his was not a new position under the CBA or Civil Service Law." (Dkt. No. 65-20, ¶ 20). After assuming this responsibility, Sergeant Tripp began "locking time-off slips in his personal locker in the men's locker room, making them completely inaccessible" to Plaintiff, who had, for the previous nine years, been permitted to give officers time off. (Dkt. No. 71-2, ¶ 7).

### 3. Signing of Leave Pass

On July 11, 2016, Plaintiff submitted a request for personal leave. (Dkt. No. 65-85, ¶ 63). Plaintiff "had discussed this leave request with Chief Crowell, who was [her] supervisor, earlier." (Dkt. No. 71-2, ¶ 41). "Sergeant Tripp signed [Plaintiff's] leave slip in a spot designated

for supervisor." (*Id.*). "Only Plaintiff's supervisor, Defendant Crowell, could approve a request

for leave." (Dkt. No. 65-93, ¶ 180; Dkt. No. 71-7, ¶ 180). Sergeant Tripp avers that he "signed

Plaintiff's leave slip to recognize that the leave was on the schedule and the shifts were filled"

and not "to approve her request for leave, as only Chief Crowell could" do that. (Dkt. No. 65-85,

¶ 65). Plaintiff filed a grievance to establish she "still had seniority over the other two sergeants

because it appeared . . . some of her responsibilities were being taken away." (Dkt. No. 71-2, ¶

41; Dkt. No. 65-16, at 90). Plaintiff alleged in the grievance that Sergeant Tripp violated the

CBA "when he signed senior ranking Sergeant Comerford's time off slip." (Dkt. No. 65-79, at

2). Plaintiff wrote that as Chief Crowell was her direct supervisor and Sergeant Tripp was "junior

to Sergeant Comerford," he should "not be approving a senior Officer's time off." (Dkt. No. 65-

79, at 2). Plaintiff requested that Chief Crowell enforce the CBA as well as the NSPD's General

Orders "regarding rank, seniority and levels of command" and that "all time off slips be

submitted directly to the Chief of Police for the rank of Sergeant and approved by same." (Dkt.

No. 65-79, at 2). Plaintiff testified that the outcome of the grievance was that "Chief thought

[she] was being petty." (Dkt. No. 65-16, at 89). From that point forward, Chief Crowell signed

Plaintiff's leave slips. (*Id.* at 93)

### 4.      Reference to Plaintiff as "She" or "Her"

Following Plaintiff's filing of the July 2016 grievance, Chief Crowell "began to refer to

[Plaintiff] as 'she' or 'her' to others and, at times, in [Plaintiff's] presence." (Dkt. No. 71-2, ¶

43). Prior to filing the grievance, Chief Crowell always referred to Plaintiff as Sergeant or

Roberta. (Dkt. No. 65-16, at 143). After, Plaintiff "became a 'she'" or a "her"—she "didn't have

a name" and was not "referred [to] by rank or status anymore." (*Id.* at 142–43). For example,

when Chief Crowell would ask the other officers where Plaintiff was, "it was always 'Do you

know where she is?'" rather than refer to her by her name or rank. (Dkt. No. 71-2, ¶ 43; Dkt. No.

65-16, at 146). Plaintiff did not hear Chief Crowell ask "where other officers were simply by the use of a pronoun" and stated that he "usually" referred to the other officers by "first name or by their rank," although she was the "only full-time female" and "they had a whole lot of 'hims'" at the NSPD. (Dkt. No. 65-16, at 146). The record contains a copy of on envelope with the note by Chief Crowell that reads "Please have her return old ID." (Dkt. No. 71-1, at 268; Dkt. No. 65-93, ¶ 235; Dkt. No. 71-7, ¶ 235). In addition, "on the different memos that got posted, Plaintiff "wasn't Sergeant Comerford," just "Roberta Comerford"—"no rank, no status," where "previously, [Plaintiff] had status." (Dkt. No. 65-16, at 144–45). Chief Crowell responds that he "canno[t] unequivocally state that [he] never referred to Plaintiff via use of female pronoun" but if he did "it was not done to disparage Plaintiff, but merely as part of normal everyday conversation" and that he does not "refer to every person by their proper name at all times." (Dkt. No. 65-20, ¶ 193).

### 5.   Performance Observation Report and Quality Assurance Report – DWI Investigation

On August 14, 2016, Plaintiff conducted a DWI investigation with NSPD Police Officer Shane Chimber, a junior officer whom she was training. (Dkt. No. 71-2, ¶¶ 27, 31). On arrival, they "discovered a[n empty] truck with front-end damage"; there was a man nearby who appeared to be intoxicated but he "did not initially admit to driving the vehicle." (*Id.* ¶ 27). Plaintiff told Officer Chimber they "would need to establish that this man had been driving" and, rather than telling him what to do, prompted him to "think for himself" by asking how he wanted to proceed. (*Id.* ¶ 28). When Officer Chimber "was unable to come up with any plan of action," Plaintiff "gave him several options," but Officer Chimber "became increasingly uncomfortable," (*Id.* ¶ 29), and angry with Plaintiff, (Dkt. No. 65-16, at 95), and pointed to her chest and said: "No. What do you want to do?" (Dkt. No. 65-16, at 99–100). Following the arrival of an officer

from the Cicero Police Department, they "were able to establish that the man had been driving while intoxicated" and Officer Chimber made the arrest. (Dkt. No. 71-2, ¶ 31; Dkt. No. 65-20, ¶ 123).

The same day, Chief Crowell prepared a "Complaint Form" regarding Plaintiff's conduct during the DWI investigation; he alleged that while "working as the first line supervisor," Plaintiff "showed incompetence as she failed to properly supervise and instruct a subordinate during the investigation of a man who was suspected of DWI." (Dkt. No. 65-58, at 2; Dkt. No. 65-20, ¶ 125). On August 15, 2016, Chief Crowell prepared a Performance Observation Report and Complaint arising from Plaintiff's participation in the DWI investigation. (Dkt. No. 65-20, ¶ 123; Dkt. No. 65-54). Chief Crowell obtained memoranda from, among others, Officer Chimber and the Cicero Police Officer "concerning their observations of Plaintiff during the DWI investigation." (Dkt. No. 65-20, ¶ 123; Dkt. Nos. 65-55 to 65-57). Chief Crowell concluded that Plaintiff "failed to exhibit the appropriate guidance to a junior officer that is a requirement of her rank." (Dkt. No. 65-20, ¶ 124). Plaintiff contends that Chief Crowell "chose to credit Officer Chimber's version of the events despite him being a much more junior officer and his behavior on the scene that bordered on insubordination." (Dkt. No. 71-2, ¶ 31).

On August 29, 2016, Chief Crowell issued a Quality Assurance Report "concerning Plaintiff's property damages auto accident investigation" in connection with the August 14, 2016 DWI investigation and arrest. (Dkt. No. 65-93, ¶ 139; Dkt. No. 71-7, ¶ 139; Dkt. No. 65-69, at 2; Dkt. No. 71-2, ¶ 32). Plaintiff avers that Chief Crowell's "issues with the report were caused by Officer Chimber's failure to complete and/or provide [Plaintiff] with the prerequisite paperwork," despite Plaintiff's "numerous requests." (Dkt. No. 71-2, ¶ 32).

### 6.    Complaint Form – Petit Larceny Arrest

On September 12, 2016, Chief Crowell "prepared a NSPD Complaint form concerning Plaintiff's arrest of a suspect in a petit larceny investigation" that same day.[6] (Dkt. No. 65-20, ¶ 127; Dkt. No. 65-60, at 2). In the complaint, Chief Crowell asserted that Plaintiff "arrested a female for Petit Larceny when her investigation did not support this charge; this action exposed the agency to liability and demonstrates gross incompetence for an 18 year veteran." (Dkt. No. 65-60, at 2). According to Chief Crowell, "Plaintiff arrested a female for petit larceny when . . . there was no evidence that the suspect actually possessed the stolen goods, thereby negating any charge for petit larceny." (Dkt. No. 65-20, ¶ 128). Chief Crowell "confirmed that Plaintiff charging the suspect for petit larceny was incorrect after discussing the facts of the case with the Onondaga County District Attorney's Office." (*Id.* ¶ 129). On September 14, 2016, Chief Crowell called Plaintiff into his office and said that she had "violated [the arrestee's] civil rights" and that the arrestee should not have been arrested for petit larceny. (Dkt. No. 65-16, at 124).

Plaintiff states that she "made the arrest based on [her] review of surveillance video from the store where the goods were stolen showing one individual hand the stolen items to another who concealed them and left the store." (Dkt. No. 71-2, ¶ 34). Plaintiff further states that "proceeds of the larceny were present at the arrestee's house" and that the "individuals were acting in concert as accomplices." (*Id.*). On October 6, 2016, Plaintiff spoke with "Onondaga County Sheriff's Sergeant Andrea Bastedo about the circumstances of the arrest" and Sergeant Bastedo "communicated with Chief Assistant District Attorney Allison Fineberg who confirmed there was nothing wrong with the arrest as made." (Dkt. No. 71-2, ¶ 35; Dkt. No. 65-16, at 127).

---

[6] Plaintiff states she "never received a Complaint form on September 12, 2016 from Chief Crowell." (Dkt. No. 71-2, ¶ 33).

"Chief ADA Fineberg called Chief Crowell" and Plaintiff "believe[s]" that ADA Fineberg told Chief Crowell that the arrest was proper. (Dkt. No. 71-2, ¶ 35).

### 7.     Notice of Statement and Charges – Demotion

On September 27, 2016, Chief Crowell sent Plaintiff, via certified mail, a "Notice of Statement and Charges" concerning the DWI investigation and petit larceny investigation and notice that he was seeking the penalty of demotion. (Dkt. No. 65-20, ¶ 131; Dkt. No. 65-61, at 2–4; Dkt. No. 65-18, at 46–47). In his affidavit, Chief Crowell states that he "filed these charges against Plaintiff as it had become clear over the prior months that Plaintiff was not meeting the minimum requirements of her rank as a Sergeant." (Dkt. No. 65-20, ¶ 132). Chief Crowell found that the "repeated issues with her investigations and reporting" and "the DWI investigation and petit larceny investigation," "raised significant concerns that Plaintiff lacked the ability to adequately and properly supervise subordinate officers" and "lacked a proper understanding of basic legal concepts." (*Id.*).

The notice contained eight charges against Plaintiff. Six charges were in connection with the DWI investigation: "Charge 1"—"Failure to direct field activities"; "Charge 2"—"Failure to train a subordinate"; "Charge 3"—"Failure to directly supervise an officer in the [p]atrol [s]ection"; "Charge 4"—"Failure to use authority"; "Charge 5"—"Failure to be truthful during an investigation"; "Charge 6"—"Failure to maintain sufficient competency based on position and rank." (Dkt. No. 65-61, at 2–3). Two charges were in connection with the petit larceny investigation: "Charge 7"—"Failure to conduct an arrest based upon reasonable cause to believe as listed in the NYS Criminal Procedural Law Article 140"; and "Charge 8"— "Failure to maintain sufficient competency based on rank." (*Id.* at 3–4). Chief Crowell wrote that:

> Sgt. Comerford has been employed as a Police Officer since January
> of 1998 and based on her position and rank, she should have known
> that the above described conduct was improper and unacceptable. In

> addition, the above listed performance and conduct follows multiple
> previous counseling and training disciplinary actions; none of which
> resulted in corrective behavior.

(*Id.* at 4). Chief Crowell notified Plaintiff that he was "seeking the penalty of Demotion in Rank"

from sergeant to police officer, effective September 28, 2016,[7] and that she had "five (5) working

days to submit a challenge to this discipline" to him and that if he rejected her challenge, she

could submit a challenge to the Village Board, which would "review the disciplinary action

taken." (*Id.*). Chief Crowell advised that it was Plaintiff's "option to appear before the Village

Board to state why [she] challenge[d] the disciplinary action." (*Id.*).

    Plaintiff had training with Chief Crowell and others the evening of September 27, 2016,

(Dkt. No. 65-16, at 133). Chief Crowell did not mention the charges or the letter he had sent that

day. When Plaintiff arrived home from the training, there "was a green certified postcard"

waiting for her. (*Id.* at 134). Concerned and unable to "pick up the mail" at that point, Plaintiff

called Sergeant Stassi, who told her that Chief Crowell, Officer DeGirolamo, and Officer

Chimber were still at the training site "celebrating and having drinks." (*Id.*). Chief Crowell

acknowledged that he, Officer Chimber, and then-Officer DeGirolamo drank beer together after

the training but states that he never "celebrated Plaintiff's demotion" and denies having had

drinks with other officers to celebrate Plaintiff's demotion. (Dkt. No. 65-18, at 49, 56; Dkt. No.

65-20, ¶ 185). He did not invite Plaintiff to stay for beer after the training because he "[n]ever

had the opportunity." (Dkt. No. 65-18, at 53).

    On September 28, 2016, given "the repeated examples of Sergeant Comerford failing to

comply with the minimal requirements of her positions, including a concerning lack of

---

[7] Chief Crowell testified that he spoke with "County personnel," who told him that "discipline could be imposed prior to any form of hearing." (Dkt. No. 65-18, at 64).

leadership capabilities over subordinate officers," Chief Crowell issued a personnel order, demoting Plaintiff to the rank of police officer and reassigning "[a]ll [s]upervisory responsibilities." (Dkt. No. 65-20, ¶ 133; Dkt. No. 65-62, at 2).

Plaintiff did not learn of her demotion "until lunchtime" on September 28. (Dkt. No. 65-16, at 134). When Plaintiff advised Sergeant Stassi of her demotion, "he stated 'They're after you,' referring to Chief Crowell and other members of the command staff at NSPD," that "the demotion was without basis," and that "he felt [Plaintiff] was being treated unfairly because of [her] gender." (Dkt. No. 71-2, ¶ 62). Chief Crowell posted a memorandum regarding Plaintiff's demotion on the office bulletin board. (Dkt. No. 65-16, at 140).

Plaintiff immediately "challenged the Notice of Statement and Charges, including her demotion to the rank of Police Officer." (Dkt. No. 65-93, ¶ 152; Dkt. No. 71-7, ¶ 152; Dkt. No. 65-63, at 2). On October 5, 2016, Chief Crowell "denied Plaintiff's challenge" and advised Plaintiff that "[p]er the CBA," she could "submit an appeal to this rejection to the Village Board with-in five working days." (Dkt. No. 65-93, ¶ 153; Dkt. No. 71-7, ¶ 153; Dkt. No. 65-64, at 2). "Plaintiff escalated her challenge of the discipline, including the demotion, to the Mayor."[8] (Dkt. No. 65-93, ¶ 154; Dkt. No. 71-7, ¶ 154).

### 8. Supervision by Sergeants Tripp and DeGirolamo

"When [Plaintiff] was removed from the Sergeant's position, [her] duties were taken over by the two male sergeants, Sgt. Stassi and the newly appointed Sgt. Tripp." (Dkt. No. 71-2, ¶ 63). In November 2016, Sergeant Stassi left the NSPD, "leaving the NSPD with one Sergeant, Sergeant Tripp." (Dkt. No. 65-78, ¶ 6). Officer DeGirolamo "was selected for promotion to the

---

[8] In accordance with the terms of the CBA, any grievance "not satisfactorily resolved" by the Chief of Police, "shall be presented in writing to the Mayor" of the Village of North Syracuse. (Dkt. No. 71-1, at 71–72). If the "dispute is not settled" by the Mayor, "the dispute shall be submitted to final and binding arbitration." (*Id.* at 72). At all relevant times, the Mayor of the Village of North Syracuse was Gary Butterfield. (Dkt. No. 65-16, at 21).

rank of Sergeant to fill Sergeant Stassi's position." (*Id.* ¶ 7). Despite having less experience and education than Plaintiff, (Dkt. No. 65-18, at 157), Sergeants DeGirolamo and Tripp "split the duties that were previously [Plaintiff's]," (Dkt. No. 65-78, ¶ 3; Dkt. No. 71-2, ¶ 63), and were responsible for her supervision and "nonpunitive" discipline, (Dkt. No. 65-18, at 155), including verbal and written counseling, Performance Observation Reports and Quality Assurance Reports,[9] (Dkt. No. 65-93, ¶ 53).

### 9.      Bereavement Leave

Plaintiff's father passed away on November 26, 2016. (Dkt. No. 65-93, ¶ 237; Dkt. No. 71-7, ¶ 237). Plaintiff called the NSPD and spoke with Sergeant Tripp to request "three days of bereavement leave and one day of personal leave" beginning the following day, November 27, 2016. (Dkt. No. 65-93, ¶¶ 237–39; Dkt. No. 71-7, ¶¶ 237–39; Dkt. No. 65-16, at 147). Sergeant Tripp "became argumentative and did not want to approve [Plaintiff's] request for leave" because "he did not think [she] gave sufficient notice," and argued that Plaintiff "couldn't have the next day off" as personal leave "because it was less than 60 hours" before her shift. (Dkt. No. 71-2, ¶ 45; Dkt. No. 65-16, at 147). Ultimately, Sergeant Tripp told Plaintiff she could "have the next three days off as bereavement and the [fourth] day as personal." (Dkt. No. 65-16, at 147–48).

Defendants did not attend Plaintiff's father's funeral. (Dkt. No. 65-93, ¶ 245; Dkt. No. 71-7, ¶ 245). Plaintiff asserts that it "was the custom and practice of NSPD officers to attend the funerals of other officers' family members" and that Chief Crowell and Sergeant DeGirolamo attended another officer's "father's calling hours in 2015." (Dkt. No. 71-2, ¶ 46). Defendants

---

[9] Plaintiff asserts "[s]uch reports are 'training,' not 'discipline.'" (Dkt. No. 71-7, ¶ 53; Dkt. No. 71-1, at 2–16 (General Order 303 "Personnel Early Warning System")).

dispute there was such a custom, (Dkt. No. 65-93, ¶ 246); Chief Crowell testified that attendance

of the funeral of a co-worker's family member "is solely left to the discretion of the officer."

(Dkt. No. 65-20, ¶ 195).

### 10.   Counseling Memorandum – Comments at December 15, 2016 Union Meeting

On December 15, 2016,[10] Plaintiff attended a union meeting at police headquarters. (Dkt.

No. 65-65, at 2). At the meeting, "discussion turned to Sergeant Tripp's treatment of other

employees" and NSPD Clerk Mary Renna asked "no one wants to bring up our favorite Sergeant

and his abusive behavior?" (Dkt. No. 71-2, ¶ 47). Plaintiff responded that she "could shoot him

because of his aggressive behavior."[11] (Dkt. No. 65-16, at 154; Dkt. No. 71-2, ¶ 47). Sergeant

Tripp, who was not at the meeting, learned of Plaintiff's statement and reported it to Chief

Crowell. (Dkt. No. 65-85, ¶ 102).

On December 20, 2016, Chief Crowell issued a memorandum regarding Plaintiff's

statement at the union meeting. (Dkt. No. 65-65, at 2; Dkt. No. 65-20, ¶¶ 138–39). He noted that

Plaintiff's "comment is clearly in violation of General Order #302 'Workplace Harassment' and

the North Syracuse Personnel Policy Section 17 involving Workplace Harassment and will not

be tolerated!" (Dkt. No. 65-65, at 2). Chief Crowell wrote that "[t]his memorandum shall serve

to document the incident, [his] immediate response as corrective action and the clarify the rules

associated with Hostile Work Environment." (*Id.*). Plaintiff states that her "statements at the

meeting were similar to how police officers both at NSPD and elsewhere commonly speak," and

---

[10] While Defendants' Statement of Material Facts, Sergeant DeGirolamo in his affidavit, and Plaintiff in her deposition refer to this meeting as occurring on December 15, 2016, (Dkt. No. 65-93, ¶ 247; Dkt. No. 65-78, ¶ 22; Dkt. No. 65-16, at 153), the memorandum from Chief Crowell regarding this meeting refers to the meeting as occurring on December 14, 2016, (Dkt. No. 65-65, at 2). The date is not material.

[11] Sergeant DeGirolamo, who attended the meeting, avers in his affidavit that Plaintiff stated that "she wanted to shoot Sergeant Tripp in the head." (Dkt. No. 65-78, ¶ 23).

that "Sergeant Tripp had made similar comments himself in the past, such as 'Tell Mary I could

kill her,'" but that "Chief Crowell never, in the past, took issue with other officers using such

language." (Dkt. No. 71-2, ¶ 48). Plaintiff agreed, however, that she should not have made the

statement. (Dkt. No. 65-93, ¶ 254; Dkt. No. 71-7, ¶ 254).

### 11.    Discussions with Mayor – Denial of Demotion Grievance

On December 15, 2016, Plaintiff and her union representative met with Mayor Butterfield

regarding her demotion. (Dkt. No. 71-2, ¶ 60). Mayor Butterfield advised that "he would not

disturb the Chief's decision." (*Id.*). Plaintiff told the Mayor that she felt she "was being singled

out and unfairly treated." (*Id.*). Plaintiff advised the Mayor that she was "a well respected female

officer in the military," that most of her "colleagues in the military are men" and that she had

"excelled in the male dominated environment without incident." (*Id.*). Plaintiff states in her

affirmation that by making these statements, she was communicating to the Mayor that she "felt

she was being mistreated because of her gender." (*Id.*). Plaintiff also told the Mayor: "every time

I turn around I can't win." (*Id.*). The Mayor told Plaintiff that Chief had "advised him" that

Plaintiff "lack[ed] leadership abilities." (*Id.*). Plaintiff responded by offering to show the Mayor

her "stellar military evaluations to demonstrate that the issues with [her] performance as reported

by Chief Crowell were not genuine." (*Id.*). The Mayor replied that "he needed to 'support [his]

department heads and his police chief.'" (*Id.*). On December 27, 2016, Mayor Butterfield denied

Plaintiff's grievance concerning her demotion. (Dkt. No. 65-93, ¶ 158; Dkt. No. 71-7, ¶ 158;

Dkt. No. 65-66, at 2).

### 12.       Counseling Memorandum – Response to Medical Call

On or about December 22, 2016,[12] Plaintiff "responded to a call involving a medical emergency" and "announced [her] arrival through the computer system" before realizing that she was at the wrong address. (Dkt. No. 71-2, ¶ 49). Plaintiff then proceeded to the correct location, where Sergeant DeGirolamo was waiting; Plaintiff was the second person in the house despite the incorrect address. (*Id.* ¶ 50). Afterward, Sergeant DeGirolamo ordered Plaintiff to complete a memorandum, which she did. (Dkt. No. 71-2, ¶ 51; Dkt. No. 65-81, at 2). Sergeant DeGirolamo rejected the first memorandum and "screamed at [Plaintiff] at the top of his lungs and told [her] to write another memorandum recounting turn-by-turn where [she] had gone" and that she "was not allowed to leave until [she] had done so." (Dkt. No. 71-2, ¶ 51). Plaintiff completed the second memorandum "but did not know the exact addresses where [she] turned around because it had occurred at night when it was dark." (*Id.*; Dkt. No. 65-82, at 2).

On January 10, 2017, Sergeant DeGirolamo issued a counseling memorandum concerning the December 22, 2016 incident. (Dkt. No. 65-93, ¶ 160; Dkt. No. 71-7, ¶ 160; Dkt. No. 65-83, at 2). He avers that he "issued the Counseling Memorandum as it was clear that Plaintiff was not providing a truthful description of what had transpired on December 22, 2016." (Dkt. No. 65-78, ¶ 39). Sergeant DeGirolamo wrote:

> This counseling memo will serve as documentation that I have spoken to you about when responding to calls, especially Priority 1 calls for service, that you respond quickly and in a safe manner. Also, in the future if you make a mistake and call arrived at the wrong address, you WILL IMMEDIATALEY advised [sic] control over the air of your error and tell them you are still enroute [sic].

---

[12] The Statement of Material Facts refers to this incident as occurring on December 23, 2016, (Dkt. No. 71-7, ¶ 160). Both Plaintiff and DeGirolamo refer to the incident as occurring on December 22, 2016. (Dkt. No. 71-2, ¶ 49; Dkt. No. 65-78, ¶ 40). The date is immaterial.

(Dkt. No. 65-83, at 2). Plaintiff asserts the direction to "announce over the air every single time that [she] mistakenly went to the wrong address in the future" "was done to embarrass and harass me; no other officers were expected to report as such." (Dkt. No. 71-2, ¶ 51).

### 13.    Investigation for Insubordination – Meals at Restaurants

On February 15, 2017, Sergeant DeGirolamo "informed Plaintiff and her partner, Officer John McQuaid that they were not to sit down at restaurants for meals" "as it does not fare well in the eyes of the public." (Dkt. No. 65-93, ¶ 279; Dkt. No. 71-7, ¶ 279; Dkt. No. 65-78, ¶ 41). Plaintiff states that Sergeant DeGirolamo told them that they "were not allowed to eat out at restaurants while on duty for a couple of weeks" "per Chief Crowell's wishes." (Dkt. No. 71-2, ¶ 52). Neither Plaintiff nor Officer McQuaid "were happy about it because [they had] never violated a policy pertaining to eating"[13] and "were allowed to take a meal break" when they were "not on calls." (Dkt. No. 65-16, at 166). Officer McQuaid states that when he told Sergeant DeGirolamo that the direction "was a violation of the contract," Sergeant DeGirolamo responded that they should "give it a couple weeks" and that "[l]ater he stated he 'didn't give a fuck what we did.'" (Dkt. No. 71-5, ¶ 3). Plaintiff and Officer McQuaid state that "[n]o other officers were given such orders, but [they] complied." (Dkt. No. 71-2, ¶ 52; Dkt. No. 71-5, ¶ 5). Sergeant DeGirolamo states that in mid-March 2017, Officer McQuaid inquired as to "whether the order concerning restaurants remained in effect, and [he] indicated to [Officer McQuaid] it was." (Dkt. No. 65-78, ¶ 42). Officer McQuaid states that when he spoke to Sergeant DeGirolamo in March 2017 about the direction "and reminded him that more than two weeks had passed" and that

---

[13] The NSPD Rules of Conduct state that "during working hours": "Members may enter any establishment serving intoxicating beverages for the purpose of having a meal providing that they sit in an area away from any bar area." (Dkt. No. 65-22, at 12).

Sergeant DeGirolamo "did not renew his request to us or comment further other than to say 'relax.'" (Dkt. No. 71-5, ¶ 7). "Thereafter," Plaintiff and Officer McQuaid "recommenced taking [their] meals, by visiting restaurants." (*Id.* ¶ 8).

On March 23, 2017, Plaintiff and Officer McQuaid "went to eat at Ling Ling Restaurant" "while on break." (Dkt. No. 71-2, ¶ 53; Dkt. No. 71-5, ¶ 9). Shortly after they arrived, "a call went out for [Plaintiff] to respond to." (Dkt. No. 71-2, ¶ 53). As Plaintiff's "radio had low batteries," she "used Officer McQuaid's radio to answer and immediately left the restaurant to attend to the call." (*Id.*). More specifically, at "14:45:51 and 14:45:58 [Plaintiff] attempted to answer [her] own radio, then answered Officer McQuaid's radio at 14:46:03." (*Id.*).

Sergeant DeGirolamo heard the call for service and heard "dispatch [twice] attempt to contact Plaintiff," who "did not answer [the] call." (Dkt. No. 65-78, ¶ 44). Sergeant DeGirolamo, used "GPS to determine the location of Plaintiff given her failure to respond to the call." (*Id.* ¶ 45). He was able to determine "that Plaintiff and Officer McQuaid's patrol cars were at the New Ling Ling Restaurant." (*Id.*). As he had "directly ordered Plaintiff and Officer McQuaid to refrain from eating at restaurants while on duty, their presence at the restaurant indicated that they may be disobeying a direct order." (*Id.* ¶ 46). Sergeant DeGirolamo therefore asked both Plaintiff and Officer McQuaid to provide "memorandums concerning their presence at the Chinese restaurant." (*Id.*¶ 47). On March 25, and 28, 2017, Plaintiff and Officer McQuaid provided memos to Sergeant DeGirolamo. (Dkt. No. 65-84, at 1–2).

On March 25, 2017, Sergeant DeGirolamo went to the restaurant and viewed the restaurant's "closed circuit camera footage from March 23, 2017." (Dkt. No. 65-78, ¶ 50). From the camera footage, Sergeant DeGirolamo "identified several discrepancies with Plaintiff's memorandum": "Plaintiff was not 'keying' her mike as she entered the restaurant"; "Officer

McQuaid was not right inside the door as [Plaintiff] entered the restaurant" but seated at a table; and that "Plaintiff sat at the table with Officer McQuaid and intended to sit down and eat at the restaurant prior to being forced to leave to handle a call."[14] (*Id.* ¶ 52). Based on the camera footage, Sergeant DeGirolamo concluded that "the memorandum Plaintiff provided was less than truthful." (Dkt. No. 65-78, ¶ 51). Sergeant DeGirolamo filed a complaint and requested that Chief Crowell "investigate both Plaintiff and Officer McQuaid for this incident." (*Id.* ¶ 54).

On March 29, 2017, Chief Crowell issued a Notice of Complaint alleging "Insubordination" in connection with her March 23, 2017, attempt to eat a meal at Ling Ling Restaurant, "advised Plaintiff of the Complaint and began an investigation." (Dkt. No. 65-20, ¶ 143; Dkt. No. 65-67, at 2). Chief Crowell issued a nearly identical Notice of Complaint to Officer McQuaid. (Dkt. No. 65-76, at 2).

Officer McQuaid states in an affidavit that he was not disciplined for this incident. (Dkt. No. 71-5, ¶ 10). Sergeant DeGirolamo told him that he "was not the focus of the investigation" and that "this is more about Roberta than you" and that Officer McQuaid "did not have to worry." (*Id.*). Plaintiff testified that Officer McQuaid later told her that Sergeant DeGirolamo had told him that his "charges of insubordination will go away" as he was "not the target. She is." (Dkt. No. 65-16, at 168). Officer McQuaid retired before the insubordination investigation concluded. (*Id.* at 169).

### 14.    Complaint – April 4, 2017 Shift

On April 4, 2017, Plaintiff "did not arrive to work" her 2:00 p.m. shift. (Dkt. No. 71-5, ¶ 11). When Officer McQuaid "called her shortly after her shift was to begin and advised her that

---

[14] In her memorandum Plaintiff stated that when she walked in the front door of the restaurant, "control called," and she "clicked [her] portable mike to respond." (Dkt. No. 65-84, at 2). Plaintiff also stated that she tried to respond to the call but could not, so she "walked up to Officer McQuaid, who was just inside the door and answered control on his portable." (*Id.*).

she was supposed to be at work," she responded that "she had forgot that she was working" that day, and asked him to "relay to the Sergeant, that she wasn't feeling well, and needed an hour of sick time." (*Id.*; Dkt. No. 71-1, at 165). Both Sergeant Tripp and DeGirolamo were present at the station and Officer McQuaid told them that Plaintiff was "sick and would need to take an hour of personal time." (Dkt. No. 71-5, ¶ 12). At 2:07 p.m., Sergeant DeGirolamo called Plaintiff and "made [her] provide details in order to embarrass [her], then snickered when [she] told him" she had diarrhea. (Dkt. No. 71-2, ¶ 37; Dkt. No. 65-19 at 36; Dkt. No. 71-1, at 169). At 2:16 p.m., Sergeant Tripp emailed Plaintiff and requested a memorandum "regarding why [she] was not at work" at 2:00 p.m., and "why a Supervisor was not notified as to [Plaintiff] being late or requesting leave." (Dkt. No. 71-1, at 165). Plaintiff "arrived for her shift later that day." (Dkt. No. 71-5, ¶ 15).

Sergeant Tripp asked Officer McQuaid to write an "interrogatory style memo" answering Sergeant Tripp's "specific questions" about his conversation with Plaintiff. (Dkt. No. 71-5, ¶ 13). Officer McQuaid "felt the use of this technique was inappropriate for the situation." (*Id.*). In his memorandum, Officer McQuaid wrote that he called Plaintiff after arriving for his shift, and that Plaintiff told him "she thought she had day off and . . . to tell Sgt. Tripp she was in bathroom and needed an hour of personal time." (Dkt. No. 71-1, at 171).

Sergeant DeGirolamo also submitted a memorandum to Sergeant Tripp regarding Plaintiff's "failure to report for duty." (*Id.* at 169). In it, he wrote that Officer McQuaid told him that Plaintiff said "she forgot she had to work that day" and "to tell the sergeants that [she] need[ed] an hour," (Dkt. No. 65-19, at 35), but that her explanation later changed to "I was sick." (*Id.*). Sergeant DeGirolamo noted that when he asked Plaintiff why she did not notify him or Sergeant Tripp for leave approval prior to her shift, she responded that she told Officer McQuaid

to tell them she needed "an hour of personal," and that when he asked why she did not call a supervisor, she responded that her "phone was in the bathroom." (Dkt. No. 71-1, at 169). Sergeant DeGirolamo noted that Plaintiff had told him she was "in the bathroom" when he called, and wrote that it appeared "based on the statements made by Officer Comerford she [sic] were less than truthful in responses." (*Id.*).

Sergeant Tripp informed Chief Crowell that "Plaintiff failed to appear for her shift on April 4, 2017," and that she "did not contact her supervising officer to request leave or advise that she would not be present at the start of the shift." (Dkt. No. 65-20, ¶ 146). Sergeant Tripp also told Chief Crowell that "there were concerns regarding Plaintiff's truthfulness as she had given conflicting versions explaining why she failed to arrive for her shift as required. (*Id.* ¶ 147). Chief Crowell notified "Plaintiff of the Complaint and began an investigation." (*Id.* ¶ 148). On April 24, 2017, Chief Crowell "prepared a Notice of Complaint concerning Plaintiff being absent without leave, which arose out [sic] Plaintiff failing to report for duty on April 4, 2017." (*Id.* ¶ 145). Chief Crowell states that "[d]uring this time, I spoke with the attorney for the Village of North Syracuse, Robert Germain, about the possibility of terminating Plaintiff based on the charges of being absent without leave and insubordination." (*Id.* ¶ 149). He further states that it was his "understanding that termination of Plaintiff was a possibility and would have been accomplished by incorporating these two charges into the September 27, 2016 Notice of Statement of Charges." (*Id.*).

### 15.    Settlement Agreement, Restoration of Sergeant Rank, and Retirement

As a result of Plaintiff's October 2016 initiation of the CBA's grievance process to challenge her demotion, (*see* Dkt. No. 65-80, at 2–3 (October 6, 2016 Grievance), Plaintiff, her union, and the Village of North Syracuse entered a settlement agreement in June 2017 restoring her rank to sergeant with back pay, and withdrawing all charges of misconduct, (Dkt. No. 65-69,

at 2–3). Under the settlement agreement, Plaintiff would retire on January 5, 2018, and use paid

leave time from September 1, 2017 through the date of her retirement. (*Id.* at 3). Chief Crowell

was opposed to reinstating Plaintiff as sergeant, but signed the stipulation in agreement. (Dkt.

No. 65-18, at 193–94). Though Plaintiff was reinstated as of June 23, 2017, (Dkt. No. 65-93, ¶ 7;

Dkt. No. 71-7, ¶ 7), and worked until August 29, 2017, her "name never was returned to the

Sergeants' door, and [her] title was not reinstated in the computer system." (Dkt. No. 71-2, ¶ 43).

Further, Plaintiff learned from other NSPD officers, that Chief Crowell and DeGirolamo had

"directed NSPD officers that they were not required to listen to [Plaintiff] and to call out on

detail every day," the consequence of which was that Plaintiff had difficulty "serv[ing] as a

supervisor," was required "to respond to calls that should have been taken by junior officers,"

and was often left "to patrol alone." (*Id.* ¶ 40). Plaintiff's "last physical day" at the NSPD was

August 29, 2017. (Dkt. No. 65-16, at 85). Following the settlement agreement and Plaintiff's

reinstatement to the sergeant rank, she received back pay she was due at the sergeant rate. (*Id.* at

177).

### 16.    Other Incidents

#### a.    Sergeant DeGirolamo's Conduct

Between May and July 2017, Sergeant DeGirolamo "began leaving the toilet seat down

when he used the bathroom before [Plaintiff] causing there to be drops of his urine on the seat

when [Plaintiff] needed to use it." (Dkt. No. 71-2, ¶ 55). He also parked Plaintiff's "police car in

the far end of the garage even when other bays were not being used" and in the bay that was "the

most difficult to back a car out of." (*Id.*). In addition, Sergeant DeGirolamo "made disparaging

remarks on-duty about women, including referencing them as 'bitches,' 'broads,' and 'cunts'"

and did so in Plaintiff's presence, "the presence of other officers, and Chief of Police Crowell."

(*Id.* ¶ 57). Plaintiff was also present "on numerous occasions where DeGirolamo referred to

Officer Ashley Smith as a 'bitch' and 'cunt.'" (*Id.* ¶ 57). Plaintiff "regularly admonished Sergeant DeGirolamo for his language," but he disregarded her "objections and instructions to stop using that language" both when she was a Sergeant and after her demotion to police officer. (*Id.*). "This was witnessed by Chief Crowell who never . . . intervened to admonish or correct DeGirolamo." (*Id.*). DeGirolamo acknowledged using this language in Plaintiff's presence as well as that of other officers and Chief Crowell. (Dkt. No. 65-19, at 86–87). In addition, Sergeant DeGirolamo "made comments of a sexual nature," while talking with other officers "in the patrol room" and in Plaintiff's presence. (Dkt. No. 71-2, ¶ 58). Sergeant DeGirolamo asked Plaintiff "several times 'when is the last time you were laid'" and when Plaintiff responded "that it was none of his business," "he persisted in asking [Plaintiff] that question many times." (*Id.* ¶ 57). DeGirolamo acknowledged asking Plaintiff this question and stated that Plaintiff asked him "about [his] sex life as well" and explained that it was not "a one-way conversation." (Dkt. No. 65-19, at 29). DeGirolamo also acknowledged that he "peed with the door open plenty of times" and that Plaintiff told him to close the door on repeated occasions. (*Id.* at 80).

### b.      Chief Crowell – Failure to Mentor

Chief Crowell "entertained a meaningful back-and-forth with male officers seeking his advice regarding arrests and charges" but when Plaintiff approached him for such advice, "he merely referred [her] to the law" and "gave [her] no feedback." (Dkt. No. 71-2, ¶ 65). When Plaintiff sought Chief Crowell's advice on personnel matters, he would refer her to the General Orders and "never entertain any sort of productive or professional dialogue" with Plaintiff. (*Id.*).

### D.      Certification Revocation

"Police officers are required by Albany . . . Division of Criminal Justice, to be certified." (Dkt. No. 65-16, at 172). A police officer is certified after completing Policy Academy." (*Id.* at 173). The New York Division of Criminal Justice Services ("DCJS") is required to "collect

information to maintain, on a current basis, a registry of all police officers . . . in the state." N.Y.

Exec. Law § 845(1). New York Executive Law § 845 requires a chief of police to "immediately"

advise the DCJS if an officer has "ceased to serve." N.Y. Exec. Law § 845(2).

On September 1, 2017, Chief Crowell signed a "Police Officer Registry Update Form"

("Police Registry Form") reporting Plaintiff's "deletion" effective January 5, 2018. (Dkt. No. 65-

74, at 2). The form requires the entry of a "reason for deletion" and provides a number of options

including leave of absence, resignation, "removal (other than removal for cause)," and removal

for cause. (*Id.*). Chief Crowell identified the reason as "4d," one of the options within option 4,

"removal for cause." Option 4 is "removal for cause . . . for incompetence or misconduct

pursuant to:" (4a) a hearing under section 75 of the Civil Service Law, (4b) a CBA or (4c) other

applicable law, and (4d) is "an employee's resignation or retirement while a disciplinary process

has commenced pursuant to "(4a), (4b) or (4c)." Thus, by identifying the reason as "4d" Chief

Crowell indicated that Plaintiff had resigned or retired while a disciplinary process had been

commenced, pursuant to section 75 of the Civil Service Law, a CBA or other applicable law,

which may result in removal. (*Id.*). *See, e.g.*, 9 N.Y.C.R.R. § 6056.2(g)(2) (providing that

removal for cause "means removal for incompetence or misconduct" "by an employee's

resignation or retirement while a disciplinary process has commenced pursuant to" a hearing

under section 75 of the Civil Service law, a CBA or any other applicable law). Chief Crowell

explained that he made this designation as Plaintiff's departure from the NSPD "was based on an

agreement that was made through a grievance process in a collective bargaining agreement" and

that it was his "understanding based on the training that it was the right thing to do." (Dkt. No.

65-18, at 96–97). Chief Crowell's "action invalidated [Plaintiff's] basic training certification

immediately." (*Id.* at 282). He was not concerned that Plaintiff would be unable to obtain

additional employment as a police officer. (*Id.* at 101).

In a letter to Chief Crowell dated October 9, 2017, David Mahany, Associate Training

Technician for the DCJS, wrote that the DCJS had received the form reporting "that Sergeant

Roberta Comerford ceases to serve your department due to incompetence or misconduct pursuant

to 9 NYCRR Part 6056.2(g)(2) and [requesting] that the Division remove Sergeant Comerford

from the Central State Registry of Police Officers and Peace Officers (Registry)." (Dkt. No. 71-

1, at 189). Mahany wrote that based on the information Chief Crowell had provided in the Form,

DCJS "has removed Sergeant Comerford from the registry effective September 1, 2017" and that

her "police officer basic training certification has been invalidated effective immediately." (*Id.*).

Mahany further wrote that "[s]hould a subsequent employer attempt to appoint and register

Sergeant Comerford with the Division, that prospective employer shall be notified of the

regulatory reason she ceased to be previously employed and the status of her basic training

certification." (*Id.*). Mahany instructed Chief Crowell to "Please ensure that Sergeant Comerford

is informed of the change in her training certification status." (*Id.*).

Chief Crowell testified that he was "familiar with the contents of the letter, but [did not]

recall receiving it," explaining that he believed he had already transferred to a new police

department at that point.[15] (Dkt. No. 65-18, at 81). He testified that he believed that the chief

who took over the NSPD indicated to him that he had been contacted by DCJS but that he did

not believe the new chief "ever forwarded the letter" to him. (*Id.* at 82). Chief Crowell did not

notify Plaintiff of the change in her training certification status. (*Id.* at 107). He "may have

---

[15] In his affidavit, however, Chief Crowell stated that he served as the NSPD Chief until October 13, 2017. (Dkt. No. 65-20, ¶ 3).

heard" that Plaintiff was working for the Hamilton Police Department but did not know whether she was working there before the time set for her retirement, did not care, and was not concerned that decertification would result in her loss of employment elsewhere. (*Id.* at 222–23).

Plaintiff learned of her decertification in or about January 2018, at which time she had been performing police duties for the Jordan and Hamilton Police Departments. (Dkt. No. 65-16, at 173). Upon learning of her decertification, Plaintiff turned in her weapon and gear. (*Id.* at 175). Plaintiff "went through the union process" to challenge the decertification. (*Id.* at 175–76).

In an email dated February 2, 2018, Mahany advised NSPD Chief Rotunno that Plaintiff had contacted the Division after learning of her decertification and advised that "although a disciplinary process had been commenced, and she did agree to retire in lieu of facing the charges, she was never in jeopardy of being terminated or removed from employment" and "worst case" she would have been demoted from sergeant to police officer. (Dkt. No. 71-1, at 215). Mahany wrote: "As you know, prior to leaving North Syracuse PD, Chief Crowell removed Sgt. Roberta Comerford as a 'Removal for Cause NYCRR Part 6056.2(g)(2): an employee's resignation or retirement while a disciplinary process has commenced . . . *which may result in removal*." (*Id.*) (emphasis in original). Mahany stated that "'[t]his action invalidated her basic training certification immediately." (*Id.*). Mahany advised that if Chief Rotunno believed there was "an issue with how Sgt. Comerford was removed from North Syracuse PD, pursuant to the regulation, I would recommend consulting your municipal attorney for further guidance." (*Id.*).

In an email on February 5, 2018, to Mayor Butterfield, Chief Rotunno wrote that per Mahany, to determine whether Plaintiff "stays certified or decertified," they would have to consider whether (1) "[a]t any time during her discipline process was TERMINATION-

REMOVAL from the department the intent of the Village; and the demotion/sergeant reinstatement negotiated as a settlement if so then the retirement was coded correctly"; or (2) "[i]f termination as [sic] not the intent and just demotion then a letter explaining the intent of the Village to amend the registry to just retired ned [sic] to be sent to DCJS." (Dkt. No. 71-1, at 214–15). Mayor Butterfield responded later that day that "[w]hen we were working through the process it was determined a demotion was the correct procedure to take Sgt. Comerford out of a leadership role." (*Id.* at 214). He further wrote that "[i]f this was challenged and we were forced to reinstate her then we would wait until she put herself or others in jeopardy again and then would terminate." (*Id.*). Mayor Butterfield suggested checking with former Chief Crowell regarding his recollection of events. (*Id.*).

In an email response that day, Chief Crowell wrote:

> The Mayor is correct and the irony is palpable! We were trying to save her career and decided to demote instead of terminate all based on the original charges; however, I had additional charges pending which would have resulted in termination. Her attorney knew this and decided to settle and the settlement included an agreement to drop all pending matters. Robert Germain, [the attorney for Village of North Syracuse] can verify this. In my opinion, the spirit and intent of the new executive fits these circumstances exactly!

(Dkt. No. 71-1, at 214). The email chain was forwarded to Robert Germain, who responded:

> As I recall, the Village moved to demote the officer (as opposed to terminate) based upon a lack of leadership/knowledge issue she had at a DWI stop as well as her history. We responded to the unit grievance regarding her demotion once it was filed. During the pendency of the demotion issue settlement discussions, another charge was made (but not formally addressed therein). Though the Chief and I discussed pressing forward with termination if necessary by incorporating the new charges, we resolved the demotion grievance by making an agreement with the union under which the officer retired. In my opinion therefore, termination was not the underlying threat that lead to retirement—demotion was. In order to avoid the expense of the threatened immediate legal action, I believe the best way to proceed is to clarify our position with the

> Department via letter as outlined in "option 2" below [presumably
> referring to option 2 on the DCJS form – "resignation"].

(*Id.* at 217). Mayor Butterfield responded: "I agree." (*Id.*).

In a letter to Mahany dated February 7, 2018, Chief Rotunno wrote that he had reviewed

the personnel investigation with Mayor Butterfield and Attorney Germain, who had handled the

investigation and concluded that the Village of North Syracuse's "intent was not to terminate

Ms. Comerford from employment with the [NSPD] or have her police certification removed by

the Division of Criminal Justice Services." (*Id.* at 219). Chief Rotunno requested that the

Division of Criminal Justice Services "accept the amended Police Officer registry that indicates

Ms. Comerfords [sic] retirement be designed for retirement as D-2 resignation effective January

5th, 2018." (*Id.*). In an amended form dated February 8, 2018, Chief Rotunno listed

"Resignation" as the "Reason for Deletion." (*Id.* at 221).

It took Plaintiff three weeks to resolve the certification issue, during which time Plaintiff

was unable to work for the Jordan or Hamilton Police Departments. (Dkt. No. 65-16, at 176). In

February 2018, Plaintiff filed a charge of discrimination with the EEOC. (*Id.* at 183). The EEOC

investigated Plaintiff's claims and issued a right-to-sue letter. (*Id.* at 184).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if

all the submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

### A.    Title VII – Timeliness

Plaintiff alleges that Defendants violated Title VII by permitting a hostile work environment and engaging in gender-based discrimination and retaliation "throughout" her employment at NSPD and citing specific conduct beginning in July 2016. (Dkt. No. 6, ¶¶ 11–12). Defendants assert that claims[16] stemming from events prior to April 7, 2017, including Plaintiff's hostile work environment claim in its entirety, are time-barred. (Dkt. No. 65-94, at 16–18).

#### 1.    300-Day Statute of Limitations

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f). "Title VII requires that individuals aggrieved by acts of discrimination [in states like New York] file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–5(e)(1)). Failing to timely file a charge "acts as a bar to a plaintiff's ability to bring the action." *Semper v. N. Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 576 (E.D.N.Y. 2011) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Though time-barred, discrete

---

[16] In their memorandum of law, Defendants seek dismissal of discrimination and retaliation claims based on alleged excessive discipline, overtime, counseling memos, and work assignments. (Dkt. No. 65-94, at 20–22). In opposition, Plaintiff identifies her "standalone discrimination claims" as the September 2016 demotion and the September 2017 police certification revocation. (Dkt. No. 71-8, at 7–14 (Title VII); *id.* at 20–21 (equal protection)). Thus, the Court deems Plaintiff's "standalone discrimination claims" as limited to the September 2016 demotion and September 2017 police certification revocation. Plaintiff's retaliation claim, however, appears to encompass more alleged conduct, including excessive discipline, and work assignments.

prior acts falling outside the limitations period may be used as "background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Plaintiff testified that she filed her EEOC charge in February 2018, after her "status was reinstated" and she was no longer "decertified." (Dkt. No. 65-16, at 183). Assuming, as Defendants do, (Dkt. No. 65-94, at 17), that Plaintiff filed her EEOC charge on February 1, 2018, unless the continuing violation doctrine applies, any alleged discriminatory actions or retaliation that occurred before April 7, 2017 (300 days prior) are time-barred for Plaintiff's Title VII claims.

### 2.        Continuing Violation Doctrine

Plaintiff argues that her September 2016 demotion from sergeant to police officer is not time-barred because it "formed a continuing violation" with the timely September 2017 revocation of her police certification and these acts were "part and parcel of Defendants' campaign to subject Plaintiff to selective treatment based on her gender and protected activity." (Dkt. No. 71-8, at 5). Plaintiff argues that her hostile work environment claim is likewise timely because "the record reveals multiple incidents of disparate and unfair treatment of Plaintiff that occurred within 300 days from the filing of her EEOC complaint." (*Id.* at 6).

Under the continuing violation doctrine, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155–56 (2d Cir. 2012) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *abrogated on other grounds by Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011)). To bring a hostile work environment claim "within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy

33

occurred within the limitations period." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 220 (2d Cir.

2004). Courts must "make an individualized assessment of whether incidents and episodes are

related." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010). "Incidents that

involve different perpetrators, actions, or targets, or are temporally distant from one another, may

be insufficiently related." *Bright v. Coca Cola Refreshements USA, Inc.*, No. 12-cv-234, 2014

WL 5587349, at \*4, 2014 U.S. Dist. LEXIS 155565, at \*9 (E.D.N.Y. Nov. 3, 2014), *aff'd sub*

*nom. Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6 (2d Cir. 2015). A plaintiff

may not "'resurrect stale claims by stating that dissimilar acts are related,' for to do so would

transform the continuing violation doctrine into 'a boundless exception to the statute of

limitations.'" *Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 544 (E.D.N.Y. 2014)

(quoting *Crosland v. City of New York*, 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001)). Finally, the

continuing violation doctrine does not apply to discrete unlawful acts, even if the discrete acts

were undertaken "pursuant to a general policy that results in other discrete acts occurring within

the limitations period." *Chin*, 685 F.3d at 157. "Such discrete acts include termination, disparate

disciplining, and negative performance evaluations." *Edner v. NYCTA-MTA*, 134 F. Supp. 3d

657, 664 (E.D.N.Y. 2015) (citing *Morgan*, 536 U.S. at 114).

### a.    The September 2016 Demotion is Time-Barred

Plaintiff's September 2016 demotion constitutes a "discrete act" of alleged discrimination

or retaliation. *See Benjamin v. Brookhaven Sci. Assocs., LLC*, 387 F. Supp. 2d 146, 153

(E.D.N.Y. 2005) ("[E]mployment practices such as failure to promote, failure to compensate

adequately, undesirable work transfers, and denial of preferred job assignments are considered

discrete acts."); *see also Birch v. City of New York*, 675 F. App'x 43, 44 (2d Cir. 2017)

(characterizing as discrete acts allegations of "punitive transfers, undesirable assignments, and

poor performance review"). It occurred prior to April 7, 2017, and is therefore barred for

purposes of Plaintiff's Title VII claims,[17]— though it "may constitute relevant background evidence" in connection with Plaintiff's Title VII claims. *Morgan*, 536 U.S. at 112. To the extent Plaintiff pursues the March 29, 2017 (restaurant issue) and April 24, 2017 (failure to report to work on time), Notices of Complaint, (Dkt. No. 65-67, at 2; Dkt. No. 65-68, at 2), as discrete, retaliatory acts, the March 29, 2017 Notice of Complaint is time-barred, but the April 24, 2017 Notice of Complaint is timely. However, to the extent Plaintiff alleges the investigations and Notices of Complaint were subsumed in and led to Chief Crowell's October 2017 decertification, and that the *decertification* is the discrete retaliatory act, they both would be relevant and timely as part of such a claim. (*See* Dkt. No. 65-20, ¶ 163 (Chief Cowell stating that "it was his understanding" that the charges stemming from the restaurant issue and Plaintiff's failure to report to work on time, "remained pending [after the settlement agreement], and that these charges could result in Plaintiff's termination"). Plaintiff cites being "forced to patrol alone, despite it being ordinary practice for officers to patrol in pairs" as a retaliatory act, and it appears to be timely—Plaintiff alleges this occurred after being reinstated to the rank of sergeant in June 23, 2017. (Dkt. No. 71-2, ¶ 40; Dkt. No. 71-1, at 178–81; Dkt. No. 65-20, ¶ 153).

      **b.**      **The Hostile Work Environment Claim is Not Time-Barred**

Concerning the timeliness of her hostile work environment claim, Plaintiff asserts that "the record reveals multiple incidents of disparate and unfair treatment of Plaintiff that occurred within 300 days from the filing of her EEOC complaint." (Dkt. No. 71-8, at 5–6). Plaintiff has adduced evidence of harassment beginning prior to the limitations period, *i.e.*, before April 7, 2017, and continuing after April 7, 2017. Viewed in the light most favorable to Plaintiff, the

---

[17] Unlike Plaintiff's Title VII claims, her § 1983 and NYSHRL claims have a three-year statute of limitations. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) ("Section 1983 actions filed in New York are . . . subject to a three-year statute of limitations."); N.Y. C.P.L.R. § 214(2).

evidence supporting Plaintiff's hostile work environment claim suggests a pattern of gender-based harassment and hostility perpetrated by DeGirolamo and, at times, tolerated by Chief Crowell, in which (1) DeGirolamo, "on numerous occasions," referred to Ashley Smith, the only other female officer at the NSPD as "'bitch' and 'cunt,'" (Dkt. No. 71-2, ¶ 57); (2) DeGirolamo referred to women generally as "'bitches,' 'broads,' and 'cunts'" in Plaintiff's presence and the presence of other officers, during her time as a sergeant (pre-September 2016) and when she was returned to officer status (September 2016 to June 2017), (*id.*); (3) Chief Crowell on occasion laughed at DeGirolamo's disparaging remarks, (*id.*); (4) DeGirolamo ignored Plaintiff's instruction to stop using the offensive language despite being her subordinate; (5) Chief Crowell refused to intervene or admonish DeGirolamo despite witnessing him ignore Plaintiff's instruction, (*id.*); (6) DeGirolamo persistently asked Plaintiff about her sexual activities even after she told him it was "none of his business," (*id.* ¶ 58); (7) despite Plaintiff's repeated requests to close the bathroom door, DeGirolamo "peed with the door open plenty of times," (Dkt. No. 65-19, at 80); (8) beginning in or about July 2016, Chief Crowell referred to Plaintiff as "she" or "her" rather than by her name or rank, (Dkt. No. 71-2, ¶ 43); (9) on or about December 22, 2016, Sergeant DeGirolamo rejected a memorandum Plaintiff had prepared at his direction and "screamed at [Plaintiff] at the top of his lungs and told [her] to write another memorandum recounting turn-by-turn where [she] had gone" and that she "was not allowed to leave until [she] had done so," (*id.* ¶ 51); (10) in May and June 2017, Sergeant DeGirolamo began leaving "the toilet seat down" in the unisex bathroom and left "drops of urine on the seat" "when [Plaintiff] needed to use it," (*id.* ¶ 55); and (11) after Plaintiff was reinstated to Sergeant in June 2017, her name was never returned to her door, her title was not reinstated in the computer system, she was required to handle calls normally handled by junior officers and she

was often left to respond on patrol alone, (*id.* ¶ 43; Dkt. No. 71-3, ¶ 14). Viewed in the light most

favorable to Plaintiff, given the evidence that the same actors, DeGirolamo and Chief Crowell,

perpetrated the conduct, the similar nature of the timely and untimely conduct—DeGirolamo's

disparaging language, Chief Crowell's tacit approval of that language, Chief Crowell's

disparaging Plaintiff's status as a sergeant and officer, and DeGirolamo's use of the unisex

bathroom in a way that was hostile to women—it is reasonable to infer that the untimely conduct

demonstrates "sufficient 'relatedness,'" to the timely conduct, *Bright*, 2014 WL 5587349, at *4,

2014 U.S. Dist. LEXIS, at *9 (explaining for purposes of the continuing violation doctrine,

"sufficient 'relatedness' may be found where the timely and untimely incidents involve 'the

same type of employment actions, occurred relatively frequently, and were perpetrated by the

same managers'" (quoting *Morgan*, 536 U.S. at 120–21)), and that it was "'part of the same

actionable hostile work environment practice' as the untimely incidents." *Bright*, 2014 WL

5587349, at *4, 2014 U.S. Dist. LEXIS 155565, at *8 (quoting *McGullam*, 609 F.3d at 76).

Accordingly, Defendants' request for summary judgment dismissing Plaintiff's Title VII hostile

work environment claim on grounds of untimeliness is denied.

## B. Gender Discrimination – Title VII, § 1983, and NYHRL

Defendants seek summary judgment dismissing Plaintiff's Title VII, § 1983 equal

protection, and NYSHRL "standalone" demotion and certification revocation, *see supra* note 16,

gender discrimination claims. (Dkt. No. 65-94, at 19–30, 37–38). Plaintiff opposes dismissal.

(Dkt. No. 71-8, at 7–14).

Title VII, in relevant part, provides that it is unlawful for an employer "to discharge any

individual, or otherwise to discriminate against any individual . . . because of such individual's

. . . gender." 42 U.S.C. § 2000e-2(a)(1). "Title VII . . . discrimination claims are governed at the

summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas*

*Corp. v. Green.*" [18] *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). "A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983." *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019). In general, Section 1983 claims and NYSHRL claims are analyzed under the same burden shifting analysis outlined below as Title VII claims and subject to the same elements, *Back v. Hastings on Hudson Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004); *Tolbert*, 790 F.3d at 434 ("Title VII . . . and NYSHRL discrimination claims are governed at the summary judgment stage by the burden-shifting analysis."), but there are four "crucial distinction[s]" between Title VII and § 1983 claims, [19] *Naumovski*, 934 F.3d at 212–13, all of which are relevant here. First, "a plaintiff advancing a claim pursuant to § 1983 must" establish that "the alleged deprivation was committed by a person acting under color of state law"—"Title VII has no such requirement." *Id.* at 212. Here, it is undisputed that Chief Crowell, Tripp, and DeGirolamo were state actors and thus proper defendants for purposes of a § 1983 claim. "Second, unlike a Title VII claim, which may be brought only against the employing entity, a § 1983 claim 'can be brought against an[y] individual' responsible for the discrimination." *Id.* Plaintiff brings her Title VII claims against the Village of North Syracuse and the NSPD, and her § 1983 (and NYHRL) claims against Defendants Crowell, Tripp, and DeGirolamo, individually, as well as the Village and the NSPD. "Third, while an employer may be liable under Title VII for any discriminatory conduct that can properly be attributed to the employer through agency principles," to establish liability under § 1983, a plaintiff must show that the individual defendant "personally violated a plaintiff's

---

[18] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[19] "'[I]t is well-established that the substantive standards for liability under the NYSHRL and Title VII are coextensive: '[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.'" *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011)). However, there is one relevant difference—unlike Title VII, the NYSHRL allows for individual liability. *Rojas*, 660 F.3d at 107 n.10.

constitutional rights." *Id.* Fourth, Title VII's "required degree of causation" for a gender

discrimination claim—proof that discrimination was a "motivating factor," is lesser than §

1983's, which is more stringent and requires proof that "the defendant's discriminatory intent

was a 'but-for' cause of the adverse employment action or the hostile environment." *Id.* at 214.

Under the burden-shifting framework, the plaintiff must first establish, by a

preponderance of the evidence, a prima facie case of discrimination. *St. Mary's Honor Ctr. v.

Hicks*, 509 U.S. 502, 506 (1993). "The requirements to establish a prima facie case are

'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union

Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (first quoting *Hicks*, 509 U.S. at 506; then

quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The "[e]stablishment

of a prima facie case . . . creates a presumption that the employer unlawfully discriminated

against the employee." *Burdine*, 450 U.S. at 254. The burden then shifts to the defendant, who

must articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07.

If the defendant carries that burden, the presumption of discrimination "drops from the picture,"

and the burden shifts back to the plaintiff, who must "come forward with evidence that the

defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see also Kwan v. Andalex Grp.,

LLC*, 737 F.3d 834, 845 (2d Cir. 2013). In the pretext inquiry the court is "decidedly not

interested in the truth of the allegations against plaintiff," but rather is "interested in what

motivated the employer." *Toussaint v. NY Dialysis Servs., Inc.*, 706 F. App'x 44, 45–46 (2d Cir.

2017) (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)).

### 1.    Demotion

Plaintiff claims that her demotion from sergeant to police officer is attributable to gender-based discrimination in violation of § 1983 and the NYSHRL[20] and contends the Village[21] and Defendants Crowell, Tripp, and DeGirolamo are liable for this allegedly discriminatory act.

### a.    Prima Facie Case

To establish a prima facie case of employment discrimination under Title VII and § 1983, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). The fourth factor of this test may be satisfied "through direct evidence of intent to discriminate, or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (internal citations omitted). Plaintiff has satisfied the first and second factors because it is undisputed that as a woman, she is a member of a protected class and that she was qualified to be a sergeant. In addition, Defendants do not dispute that her demotion was an adverse action. Accordingly, the Court need only consider whether Plaintiff has presented any evidence that would permit an inference that the demotion was attributable to gender discrimination.

Inference of discrimination is a "flexible [standard] that can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that [the adverse employment action]

---

[20] Plaintiff's demotion, which occurred in September 2016, is time-barred under Title VII.

[21] The claims against the NSPD are dismissed as it is not a "separate legal entit[y] capable of being party to a lawsuit." (Dkt. No. 65-94, at 15 (quoting *Penree v. City of Utica*, No. 13-cv-1323, 2016 WL 915252, at *24, 2016 U.S. Dist. LEXIS 27668 at *71 (N.D.N.Y. Mar. 4, 2016)).

occurred under circumstances giving rise to an inference of discrimination." *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 04-cv-1707, 2006 WL 2642415, at *14, 2006 U.S. Dist. LEXIS 68704, at *49 (D. Conn. Sept. 13, 2006).

Plaintiff argues that an inference of discrimination may be drawn from: (i) procedural irregularities in the demotion process in which Chief Crowell demoted Plaintiff single-handedly and without following the process prescribed in the New York Civil Service Law and CBA; (ii) the "culture" of "bias[] against women" at the NSPD, including Sergeant DeGirolamo's "[d]isparaging remarks about women," which Chief Crowell heard and tolerated, and Sergeant Crowell's provision of mentorship and guidance to male officers only; and (iii) after Plaintiff's demotion, "male officers with less experience and seniority took over Plaintiff's supervisory duties."[22] (Dkt. No. 71-8, at 8–10).

### i.      Procedural Irregularities

"'[D]epartures from procedural regularity' can create an inference of discriminatory intent, sufficient to establish a prima facie case" of employment discrimination. *Foss v. Coca Cola Enters., Inc.*, No. 07-cv-1322, 2011 WL 1303346, at *9, 2011 U.S. Dist. LEXIS 34945, at *24 (E.D.N.Y. Mar. 31, 2011) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997)). Plaintiff argues that her demotion from sergeant to police officer without a pre-deprivation hearing violated Civil Service Law § 75, and that Sergeant Crowell's demotion order, which was issued without the approval of the Mayor or Village Board, violated the CBA. (Dkt. No. 71-8, at 9).[23] Defendants respond that Plaintiff's argument is without merit as the CBA

---

[22] In addition, Plaintiff argues that Chief Crowell's positive evaluation of her performance the month before the demotion and Chief Crowell's false statement in the August 15, 2016 counseling memorandum that Plaintiff had not responded to training, when, in fact, "no remedial training was provided to Plaintiff," allow an inference of discriminatory intent. (Dkt. No. 71-8, at 9). The Court will address these allegations in evaluating pretext.

[23] The record contains two documents relevant to the disciplinary process applicable to the NSPD: the CBA and General Order 301, which outlines the NSPD's "Disciplinary System" and is issued by the "Chief of Police." (Dkt.

"is silent on whether demotion is a permissible action," but do not otherwise address her arguments of procedural irregularities. (Dkt. No. 76, at 17).

Indeed, the CBA does not refer to demotion specifically; Article 15, which governs "Discipline," states: "Disciplinary action, including discharge or suspension, shall be imposed only for just cause." (Dkt. No. 71-1, at 100). In connection with "Appointments and Promotions," the CBA states: "The Mayor with the approval of the Village Board shall make all permanent appointments, promotions, suspensions, reductions and dismissals in the [NSPD] and they shall be in accordance or compliance with the Civil Service Law of the State of New York when it applies." (*Id.* at 98).

On the other hand, General Order 301 outlines the NSPD "Disciplinary System," and specifically authorizes demotion. (Dkt. No. 71-1, at 4–10). It states, in relevant part, that the "Chief of Police may authorize . . . punitive disciplinary actions," including "Demotion," which it characterizes as a "punitive disciplinary action," (*Id.* at 8). General Order 301 allows the Chief of Police "to offer the member the opportunity to accept command discipline in lieu of formal disciplinary charges." (*Id.*). If, however, the member declines "command discipline" or the Chief does not offer "command discipline," "the member will be subjected to formal disciplinary action," and will have the option "of having the case heard before: a. A hearing officer appointed pursuant to Section 75 of the Civil Service Law" or "b. An arbitrator." (*Id.* at 9).

Here, Chief Crowell sent Plaintiff, via certified mail, a "Notice and Statement of Charges," dated September 27, 2016, notifying Plaintiff "[i]n accordance with the provisions of Section 75 of the Civil Service Law and the [CBA] between the Village of North Syracuse and

---

No. 71-1, at 4–9, 49–78 (CBA Term: June 1, 2020 to May 31, 106), 79–108 (CBA Term: June 1, 2016 to May 31, 2020)).

Teamsters Local 1149" that he was lodging eight charges against her for, inter alia, "Failure to

direct field activities," "Failure to use authority," "Failure to be truthful during an investigation,"

and "Failure to maintain sufficient competency based on position and rank." (Dkt. No. 71-1, at

136–37). Chief Crowell wrote:

> The Village of North Syracuse administers a progressive discipline
> policy and it should be noted that Sgt. Comerford has been
> employed as a Police Officer since January of 1998 and based on
> her position and rank, she should have known that the above
> described conduct was improper and unacceptable. In addition, the
> above listed performance and conduct follows multiple previous
> counseling and training disciplinary actions; none of which resulted
> in corrective behavior.
>
> Due to the nature of the charges brought against you, the Chief of
> Police is seeking the penalty of Demotion in Rank. Effective
> September 28, 2016, Sergeant Comerford will be demoted to the
> rank of Police Officer. (Personal Order #16-05)
>
> You are allowed five (5) working days to submit a challenge to this
> discipline in writing to the Chief of Police. If the Chief of Police
> rejects your challenge you may submit to the Village Board in
> writing a challenge to the disciplinary action. The Village Board will
> meet in executive session at the next Village Board meeting to
> review the disciplinary action taken. It is your option to appear
> before the Village Board to state why you challenge the disciplinary
> action. Based upon an impartial review, the Village Board can
> amend, discharge or reject the challenge. The Village Board will
> notify you within five (5) working days following their review and
> decision. If you are not satisfied with any of the actions or decisions
> of the Village Board in the above listed process you have the right
> to final binding arbitration or an Article 75 hearing.

(*Id.* at 138). This letter cites New York Civil Service Law 75 and appears to follow the CBA's

process for "challeng[ing] a disciplinary action." (*Id.* at 101). However, New York Civil Service

Law § 75(3) lists "demotion in grade and title," along with termination, as punishments that may

be imposed only *after* procedural requirements have been met, including a hearing. *See* N.Y.

Civ. Serv. Law § 75(1) (providing that covered employee "shall not be removed or otherwise

subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown *after a hearing upon stated charges* pursuant to this section."). Here, the record indicates that Plaintiff received notification of, and Chief Crowell imposed her demotion on September 28, 2016, without a pre-deprivation hearing, (Dkt. No. 71-1, at 138; 145), despite representing in ordering the demotion that "this personnel change in in accordance with Civil Service Laws" in implementing the personnel change following demotion, (*id.* at 268). Thus, Plaintiff has identified a material issue of fact regarding whether, in demoting Plaintiff without the opportunity for a hearing, Defendants violated the applicable disciplinary procedure.

ii.   **Culture of Bias Against Women - Disparaging Remarks and Failure to Mentor**

Next, Plaintiff argues that the "culture" of "bias[] against women" at the NSPD, including Sergeant DeGirolamo's "[d]isparaging remarks about women," which Chief Crowell heard and tolerated, Chief Crowell's reference to Plaintiff as "she" or "her," and Sergeant Crowell's provision of mentorship and guidance to male officers only, provides a basis for inferring gender-based animus. (Dkt. No. 71-8, at 8).

Sergeant DeGirolamo acknowledged using the words "bitch" and "cunt" in the presence of Plaintiff and other officers, and, in the case of the word "bitch," in Chief Crowell's presence as well. (Dkt. No. 65-19, at 87–88). He testified that he used the word "bitch" in the following context: "I just got off this call. This girl was a bitch. This guy was a bitch." (*Id.* at 87). Plaintiff states in her affidavit that she "was present on numerous occasions where DeGirolamo referred to Officer Ashley Smith as a "bitch" and "cunt." (Dkt. No. 71-2, ¶ 57). Plaintiff "overheard conversations between" DeGirolamo and Chief Crowell "in the Chief's office where DeGirolamo made these gender disparaging remarks" and that "the Chief . . . sometimes even laughed." (*Id.*). Plaintiff further states that Chief Crowell witnessed her "instructions/objections"

regarding Sergeant DeGirolamo's continued use of this language, "who never once intervened to admonish or correct DeGirolamo." (*Id.*).

In considering whether a remark is probative, district courts in this circuit have considered four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Here, as described above, DeGirolamo, who was, prior to Plaintiff's demotion, subject to her supervision, made gender-disparaging references to women including in his references to the only other female officer, Ashley Smith. (Dkt. No. 71-2, ¶ 57). Plaintiff "admonished DeGirolamo for his language" but he "would simply ignore" Plaintiff's objections "and continue on using the . . . offensive language." Chief Crowell, who "sometimes even laughed when DeGirolamo made these" remarks, "never once intervened to admonish or correct DeGirolamo," even when he "witnessed" Plaintiff asking him to stop. (*Id.*). Because Chief Crowell heard the remarks, and there is evidence from which a factfinder could conclude that Chief Crowell condoned them, they are fairly attributed to Chief Crowell. Although Plaintiff does not provide a time-frame for DeGirolamo's remarks, she described them as occurring on "numerous occasions." (*Id.*). A factfinder could conclude that the content of the remarks are sexually discriminatory based on the manner DeGirolamo used them. *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010) (acknowledging that the use of the word "bitch" "in many contexts reflects . . . hostility [toward women]").

There is, however, no evidence connecting the remarks to Chief Crowell's decision to demote Plaintiff. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 743 (2d Cir. 2014) (finding racially biased remarks did "not raise a triable issue of employment discrimination" where the speaker "did not review plaintiff's work, write any performance reviews, or otherwise influence school superintendents' decisions to extend plaintiff's probationary term or to deny her tenure" and where there was no temporal connection between the remarks and adverse employment action (citing *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007)); *Carrington v. Mota*, No. 16-cv-8061, 2017 WL 3835883, at *10, 2017 U.S. Dist. LEXIS 141114, at *26 (S.D.N.Y. Aug. 31, 2017) ("Mota's comment was at most a 'stray remark,' because Carrington has not described a 'causal nexus' between the comment and any adverse employment action that followed."), *report and recommendation adopted*, 2017 WL 6335903 (S.D.N.Y. Dec. 8, 2017); *Holleman v. Art Crating Inc.*, No. 12-cv-2719, 2014 WL 4907732, at *28, 2014 U.S. Dist. LEXIS 139916, at *90–91 (E.D.N.Y. Sept. 30, 2014) (concluding that "[n]o inference of discrimination arises from [owner's] email," which contained the "offensive word" "cunt" "as it does not bear any relation in content or timing to Plaintiff's firing").

Plaintiff has also adduced evidence that beginning in or about July 2016, Chief Crowell stopped referring to her by her name, Roberta, or by her rank, Sergeant, as he had done in the past and, began referring to her as "her" or "she," (Dkt. No. 65-16, at 142), even in writing in one instance, (Dkt. No. 71-1, at 268). Plaintiff never observed Chief Crowell refer to other officers through pronouns, although she was the "only female," other than Ashley Smith, who was part-time, and "they had a whole lot of 'hims.'" (Dkt. No. 65-16, at 146). While there is no evidence that Chief Crowell referred to Plaintiff as "she" or "her" in relation to her demotion (or

decertification), or that these references were made in the context of his decision-making process, the fact that he referred to Plaintiff as "she" or "her" rather than by her name or rank, during the two or three months preceding his decision to demote her, is a factor weighs in favor of an inference of gender discrimination. As the Second Circuit explained, the courts task in evaluating "stray remarks" is to assess the remarks' "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi*, 478 F.3d at 115. Here, while not a perfect fit in the "stray remarks" analysis, a reasonable factfinder could conclude that Chief Crowell was motivated by a bias against the female class.

Plaintiff's allegations of Chief Crowell's failure to mentor her, while mentoring male officers, fail to allow an inference of gender discrimination because they lack factual detail. Plaintiff provides no specifics; she asserts that when she sought advice regarding arrests, charges, or personnel matters, he "merely referred" her to the law or to General Orders. (Dkt. No. 71-2, ¶ 65). Plaintiff asserts that, in contrast, Chief Crowell "entertained a meaningful back-and-forth with male officers seeking his advice regarding arrests and charges." (*Id.* ¶ 66). Without additional facts, such as dates, details regarding the circumstances in which Plaintiff sought advice and Chief Crowell's response, any inference of gender discrimination would be speculative. *See Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371–72 (S.D.N.Y. 2005) ("[A] Plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." (quoting *Little v. New York*, 1998 WL 306545, at *5, 1998 U.S. Dist. LEXIS 21797, at *14–15 (E.D.N.Y. June 8, 1998)).

### iii.    Assumption of Duties by Male Officers

"[A]n inference of discrimination . . . arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Littlejohn v. City*

47

*of New York*, 795 F.3d 297, 312–13 (2d Cir. 2015) (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) (summary judgment)). Here, Plaintiff has presented evidence that her position was not filled following her demotion, and that Sergeant Tripp, who lacked Plaintiff's experience and education, and Sergeant Stassi, both male, took over her duties. And there is evidence that when, two months after Plaintiff's demotion, Sergeant DeGirolamo, who had less experience and education than Plaintiff, was promoted to sergeant after Sergeant Stassi left,[24] Sergeants DeGirolamo and Tripp not only split Plaintiff's duties, but were responsible for her supervision and "nonpunitive" discipline. (Dkt. No. 65-78, ¶ 3; Dkt. No. 71-2, ¶ 63; Dkt. No. 65-18, at 155).

Defendants argue that this argument is a "red herring" as DeGirolamo was "promoted to fill the position of departing Sergeant Shawn Stassi, a male officer." (Dkt. No. 76, at 15 n.5). Because a factfinder may look at the *transfer of duties* in determining whether there was gender discrimination, the fact that, on paper, Plaintiff's sergeant position remained unfilled, does not negate the inference. *See Carlton*, 202 F.3d at 135 (concluding the plaintiff demonstrated an inference of age discrimination where after his "termination his duties were transferred in part to . . . a co-worker, who was 18 years younger than [the plaintiff], and his remaining duties were given to [a second co-worker], an employee 25 years younger, who was hired three months after [the plaintiff] was discharged").

Thus, Plaintiff has established a prima facie case of gender discrimination in connection with her demotion claim.

---

[24] Defendants do not dispute Chief Crowell's involvement in the promotion of Sergeant DeGirolamo. (*See* Dkt. No. 65-85, ¶ 10 ("The Chief of Police of the NSPD then selects a candidate from the promotional list and submits that individual to the Village of North Syracuse for probationary approval.")).

### b.  Legitimate Nondiscriminatory Reasons

Once Plaintiff has shown a prima facie case of discrimination, the burden falls on

Defendants to show a "legitimate, nondiscriminatory reason" for demoting Plaintiff. *McDonnell*

*Douglas Corp.*, 411 U.S. at 802. Defendant's burden "is not a particularly steep hurdle." *Hyeck*

*v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010). It "is one of production,

not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing*

*Prods.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509). Defendants have satisfied

their burden here with evidence that the decision to demote Plaintiff was based on her "Failure to

direct field activities," "Failure to use authority," "Failure to be truthful during an investigation,"

and "Failure to maintain sufficient competency based on position and rank," and failure "to

respond to training," "poor decision making," and the "inability to supervise and lead." (Dkt. No.

71-1, at 128, 136–37). These are legitimate, nondiscriminatory reasons for demoting Plaintiff.

### c.  Pretext and Causation

At the third stage of the *McDonnell Douglas* burden-shifting analysis in a § 1983 case, a

plaintiff "must establish that the defendant's discriminatory intent was a 'but-for' cause of the

adverse employment action." *Naumovski*, 934 F.3d at 214. "It is insufficient to establish simply

that invidious discrimination was 'a motivating factor' of the offending conduct." *Id.* When

considering whether discriminatory intent was a "but-for" cause of the adverse action at the

summary judgment stage, courts "must determine whether, construing the evidence in a light

most favorable to the plaintiff, a reasonable jury could find that the adverse employment action

would not have occurred 'but-for' sex discrimination." *Id.* This "higher burden" in a § 1983

action means that in order to "establish 'pretext' . . . a plaintiff must establish that the employer's

stated reason would not, alone, constitute a sufficient basis for pursuing an adverse action." *Id.* at

215. "In other words, a § 1983 plaintiff must establish that the employer's stated non-

discriminatory reason is either false or inadequate to support the adverse employment action." *Id.*
This means that "a § 1983 plaintiff's burden at the third stage of the *McDonnell Douglas* analysis
is not simply to establish that discrimination played *some* role in her termination, but that it
played a decisive role." *Id.* at 217.

Here, Plaintiff asserts that Chief Crowell's statement that she failed to respond to training
is false because he never provided any training. In his memorandum to Plaintiff, Chief Crowell
states that "the above listed performance and conduct follows multiple previously counseling and
training disciplinary actions; none of which resulted in corrective behavior." (Dkt. No. 65-61, at
4). General Order 301, however, includes counseling memoranda and performance observation
reports, a number of which Plaintiff had received in the months leading up to her demotion, as
"essentially a training method." (Dkt. No. 65-77, at 2). The Court therefore concludes that
Plaintiff has failed to present evidence raising a material fact as to whether this reason for
demotion was false.

However, as discussed, Plaintiff has identified evidence in the record that, if credited,
would allow a conclusion that even if all of the charges Chief Crowell brought against her were
justified or true, they would be inadequate to support immediate demotion without a hearing as
the New York Civil Service Law, on which Chief Crowell relied, did not allow such action.
Viewed together with the evidence of gender discrimination, including the assignment of
Plaintiff's duties to male sergeants, and Chief Crowell's references to Plaintiff as "she" or "her,"
the Court finds Plaintiff has raised a genuine issue of material fact as to whether but-for his
hostility toward her as a female, Chief Crowell would have demoted her in a summary manner,
without a pre-deprivation hearing. While Plaintiff's Title VII demotion claim against the Village
is untimely, she also pursues a timely NYSHRL claim against the Village, thus summary

judgment with respect to her NYSHRL demotion gender discrimination claim is denied.
Accordingly, the Court turns to Plaintiff's § 1983 and NYSHRL claims against the individual
Defendants.

### d.  Liability – Individual Defendants

#### i.  § 1983

Here, Defendants do not dispute that Chief Crowell was personally involved in Plaintiff's
demotion for purposes of liability under § 1983 as well as NYHRL. He made the decision
regarding demotion and there is sufficient evidence from which a factfinder could find he was
motivated by discriminatory intent. As Defendants note, Plaintiff does not oppose Defendants'
motion for summary judgment dismissing the § 1983 and NYSHRL claims against Defendants
Tripp and DeGirolamo. (Dkt. No. 76, at 8). Having reviewed the record, the Court agrees that
Plaintiff has failed to raise a material issue of fact regarding Defendants Tripp or DeGirolamo's
personal involvement in Plaintiff's demotion. *See Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d
Cir. 2020) ("[A] plaintiff must plead and prove 'that each Government-official defendant,
through the official's own individual actions, has violated the Constitution.'") (quoting *Ashcroft
v. Iqbal*, 556 U.S. 662, 676 (2009)). Here, the only allegations against DeGirolamo that have any
bearing on Plaintiff's demotion claim concerned the disparaging language he used about women
but there is no evidence that language or DeGirolamo's conduct impacted Chief Crowell's
demotion decision in any manner. Moreover, Plaintiff identified no record evidence that would
allow an inference that Sergeant Tripp had any involvement in Plaintiff's demotion.
Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's § 1983 gender
discrimination claims against Tripp and DeGirolamo.

###### ii.     NYSHRL

Under the NYSHRL, "an individual is properly subject to liability for discrimination

when that individual qualifies as an 'employer,'" meaning that the individual "has an ownership

interest in the relevant organization or the 'power to do more than carry out personnel decisions

made by others.'" *Townsend v. Benjamin Ents., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (first

quoting N.Y. Exec. Law § 296(1); then quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 483

(1984) (per curiam)); *see also Messer v. Fahnestock & Co. Inc.*, No. 03-cv-4989, 2008 WL

4934608, at *9, 2008 U.S. Dist. LEXIS 93572, at *26 (E.D.N.Y. Nov. 18, 2008) ("[A] plaintiff

may proceed against an individual defendant . . . if the defendant . . . ha[d] the power to hire and

fire the plaintiff."). "A co-worker who 'lack[s] the authority to either hire or fire the plaintiff'

may still be held liable as an aider-abettor under NYSHRL § 296(6) if he 'actually participates in

the conduct giving rise to a discrimination claim.'" *Parra v. City of White Plains*, 48 F. Supp. 3d

542, 554–55 (S.D.N.Y. 2014) (quoting *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004)).

Plaintiff does not argue in her submissions that Tripp or DeGirolamo aided or abetted Chief

Crowell in connection with her discriminatory demotion claim. Furthermore, other than

DeGirolamo's alleged disparaging remarks, which Chief Crowell failed to quell, Plaintiff cites

no evidence that would allow a conclusion that Tripp or DeGirolamo aided or abetted the events

leading to Plaintiff's demotion. Accordingly, Plaintiff's demotion gender discrimination claims

against Tripp and DeGirolamo are dismissed.

###### 2.     Revocation of Police Certification

Defendants seek summary judgment dismissing Plaintiff's discrimination claim with

respect to the revocation of her police officer certification on the grounds that: (1) it was not an

adverse employment action as that term is defined because "it did not go into effect until after

Plaintiff's termination with the NSPD," and, in any event, was temporary and "had a minimal

impact on Plaintiff's employment"; and (2) Plaintiff has failed to present evidence that would

allow an inference of discriminatory intent. (Dkt. No. 65-94, at 29 & n.8, 30; Dkt. No. 76, at 17).

The Court evaluates this claim under Title VII, § 1983, and the NYSHRL.

**a.       Prima Facie Case**

Defendants do not contest that Plaintiff is a member of a protected class or that she was

qualified to be a police officer, accordingly, the Court considers whether Chief Crowell's

decertification was an adverse action and whether there is evidence of gender-based animus.

**i.       Adverse Action**

The Second Circuit has held that:

> A plaintiff sustains an adverse employment action if he or she
> endures a materially adverse change in the terms and conditions of
> employment. To be materially adverse a change in working
> conditions must be more disruptive than a mere inconvenience or an
> alteration of job responsibilities. A materially adverse change might
> be indicated by a termination of employment, a demotion evidenced
> by a decrease in wage or salary, a less distinguished title, a material
> loss of benefits, significantly diminished material responsibilities,
> or other indices . . . unique to a particular situation.

*Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 304 (2d Cir. 2017)

(quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). Defendants argue

that Plaintiff's decertification was a post-employment action and thus cannot qualify as an

adverse employment action. *See, e.g.*, *Hopkins v. Bridgeport Bd. of Educ.*, 834 F. Supp. 2d 58,

64–65 (D. Conn. 2011) (dismissing the plaintiff's Title VII claim that the defendant

discriminated against him "by refusing provide employment references in accordance with the

terms of the Settlement Agreement," explaining that "[t]he Supreme Court in *Burlington*

*Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–62, 66 (2006) concluded that 'Title

VII's substantive provision and its antiretaliation provision are not coterminous' and that only

the anti-retaliation provision extended to post-employment conduct of post-employment

53

discrimination"). Here, however, Plaintiff has presented evidence that she was still employed and paid, as a NSPD sergeant from September 1, 2017 through January 5, 2018, when she retired. (Dkt. No. 65-69, at 3). Without her knowledge, at Chief Crowell's direction, she was removed from the police registry and her "police officer basic training certification . . . invalidated" "effective September 1, 2017." (Dkt. No. 71-1, at 189). It is reasonable to infer from these facts that her removal from the police registry and invalidation of her basic training certification was a materially adverse change in the terms and conditions of her employment from September 1, 2017 to January 5, 2018, the date of her retirement from the NSPD. The Court therefore concludes that Plaintiff has raised a material issue of fact as to whether Chief Crowell's decertification of her police training was an adverse employment action.

### ii.     Inference of Discrimination

Plaintiff argues that, in addition to the evidence she cited in support of her demotion discrimination claim, her disparate treatment with respect to the charge of insubordination for the restaurant incident, which was one of the charges Chief Crowell relied on in concluding that Plaintiff was at risk of termination, and Chief Crowell's false statement to the DCJS that she resigned under threat of termination, allow an inference of discrimination. (Dkt. No. 71-8, at 13).

"A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). To be similarly situated in "all material respects," "a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards" and "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). While "[o]rdinarily the question of whether two employees are similarly situated is a question of fact for the jury," a court can

determine whether a plaintiff has "adduced enough evidence to support a finding" that the plaintiff and the comparators were sufficiently similarly situated to support an inference of discrimination. *Mandell*, 316 F.3d at 379.

Here, there is evidence that DeGirolamo instructed both Plaintiff and her male colleague, Officer McQuaid not to eat in restaurants while on duty. (Dkt. No. 65-93, ¶ 279; Dkt. No. 71-7, ¶ 279; Dkt. No. 65-78, ¶ 41). DeGirolamo learned that both Plaintiff and Officer McQuaid had been in a restaurant while on duty, and requested Chief Crowell investigate. (Dkt. No. 65-78, ¶ 54). Chief Crowell charged both Plaintiff and Officer McQuaid with insubordination. (Dkt. No. 65-67, at 2; Dkt. No. 65-76, at 2). There is also evidence that DeGirolamo later told Officer McQuaid that his "charges of insubordination will go away" as he was "not the target. She is." (Dkt. No. 65-16, at 168; Dkt. No. 71-5, ¶ 10). While there are additional factual issues concerning Plaintiff's conduct in connection with the restaurant incident, including whether she was truthful during the investigation and whether she had missed a call while on duty that day, the charge of insubordination was the same for both Plaintiff and Officer McQuaid, but only Officer McQuaid was told he "did not have to worry" as "this is more about Roberta than you." (Dkt. No. 71-5, ¶ 10). Chief Crowell specifically relied on this charge in support of his belief that Plaintiff was at risk of termination, (Dkt. No. 65-20, ¶ 149 (discussing the "possibility of terminating Plaintiff based on the charges of being absent without leave and insubordination")), and given the evidence of disparate treatment, the Court concludes Plaintiff has raised a material issue of fact as to gender discrimination.

Defendants do not dispute that Chief Crowell's reporting to the DCJS that Plaintiff had resigned under threat of termination was incorrect but argue that it was an "honest mistake." Chief Crowell testified that he was following his understanding of the law when he completed

the decertification paperwork. (Dkt. No. 65-18, at 81, 96–97). Defendants attribute Chief

Crowell's failure to notify Plaintiff of the decertification, in direct contravention of Mahany's

letter instructing Chief Crowell to notify Plaintiff, to his having left the NSPD. As discussed,

however, procedural irregularities can provide a basis for an inference of discrimination.

*Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("[T]he disregard or abuse of those

procedures may raise an inference of bias."). Moreover, Chief Crowell's motivations for

completing the form in the manner he did and failing to notify Plaintiff of the decertification

despite having knowledge of Mahany's letter are best left to the factfinder to resolve. (Dkt. No.

76, at 17–18; Dkt. No. 65-18, at 80–81). Accordingly, the Court concludes that Plaintiff has

satisfied her minimal burden of establishing a prima facie case of discrimination.

### b.     Legitimate Nondiscriminatory Reason

Chief Crowell states that he completed the form in the manner he did based on his

training and his "good faith understanding" of the circumstances of Plaintiff's resignation from

the NSPD: that two charges were pending against her that could have led to her termination but

she resigned rather than face the threat of termination. (Dkt. No. 65-20, ¶¶ 149, 163, 210). These

are legitimate nondiscriminatory reasons for his revocation of her certification.

### c.     Pretext

Plaintiff has presented evidence that one of the two charges that Chief Crowell relied on

in concluding termination was on the table, was the result of disparate treatment—Officer

McQuaid stated that he was told that he would not be punished, only that Plaintiff would, and

that Chief Crowell's falsely reported that she resigned while a disciplinary proceeding had

commenced for her removal for cause. Viewed together, Plaintiff has raised a material issue of

fact as to whether but-for gender discrimination Chief Crowell would have decertified Plaintiff

as a police officer. As Plaintiff satisfies the higher "but-for" standard, the Court concludes that

her evidence also satisfies the lesser Title VII "motivating factor" standard. Accordingly, Defendants' motion for summary judgment with respect to the Title VII and NYSHRL certification revocation claim against the Village is denied.

### d.    Liability – Individual Defendants

#### i.    § 1983

Again, Defendants do not dispute Chief Crowell's personal involvement in completing the Police Registry form that led to Plaintiff's decertification. There is evidence that DeGirolamo was involved in requesting that Chief Crowell investigate Plaintiff for insubordination, which was a partial basis for Chief Crowell's belief that Plaintiff was subject to termination, but there is no evidence that DeGirolamo had any part in completing the Police Registry form. Nor is there evidence of Tripp's personal involvement. Thus, no reasonable factfinder could conclude DeGirolamo or Tripp were personally involved in violating Plaintiff's equal protection rights in connection with her decertification.

#### ii.    NYSHRL

Plaintiff does not argue in her submissions that Tripp or DeGirolamo aided or abetted Chief Crowell in connection with her discriminatory decertification claim. As Defendants point out, she appears to have abandoned her discrimination claims against Tripp and DeGirolamo. (Dkt. No. 76, at 21). Accordingly, Plaintiff's gender discrimination claims against Tripp and DeGirolamo are dismissed.

### C.    Retaliation

Defendants initially moved for summary judgment dismissing Plaintiff's retaliation claims on the ground that there is no evidence that she participated in a protected activity. (Dkt. No. 65-94, at 31). They argued that Plaintiff's alleged protected activities, "two grievances she filed with her Union, and comments she made at a Union meeting," do not qualify because they

"addressed personal concerns and did not raise claims of discrimination." (*Id.*). In response, Plaintiff did not contest or oppose Defendants' arguments, but asserted that she "engaged in statutorily protected activity in December 2016 when she met with Defendant Village's Mayor about her demotion." (Dkt. No. 71-8, at 19). Defendants reply that the Court should decline to consider this new claim of retaliation as Plaintiff raised it for the first time on summary judgment. (Dkt. No. 76, at 22). The Court agrees.

### 1.      Newly-Raised Claim of Protected Activity

Courts have repeatedly held that it is improper to consider claims not asserted in the complaint and raised for the first time at the summary judgment stage. *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merit of claims asserted for the first time at the summary judgment stage and not included in the complaint); *Gonzalez v. Dist. Council 37, AFSCME, AFL-CIO, SSEU Local 371*, No. 20-cv-551, 2021 WL 329852, at *2, 2021 U.S. App. LEXIS 2802, at *4–5 (2d Cir. Feb. 2, 2021) ("The district court did not err in declining to address this claim . . . since the claim turned on an allegation not made in the amended complaint and was raised for the first time in opposition to the Union's motion for summary judgment."); *Wade v. Elec. Boat Corp.*, No. 16-cv-2041, 2019 WL 4805031, at *3 n.2, 2019 U.S. Dist. LEXIS 169148, at *8 n.2 (D. Conn. Sept. 30, 2019) ("Plaintiff attempts to allege additional adverse employment actions in her response to defendant's motion for summary judgment. Plaintiff may not raise new claims in her responsive briefing."). "It is axiomatic that 'the central purpose of a complaint is to provide the defendant with notice of the claims asserted against it.'" *Knutson v. G2 FMV, LLC*, No. 14-cv-1694, 2020 WL 2765771, at *3, 2020 U.S. Dist. LEXIS 93346, at *6–7 (S.D.N.Y. May 28, 2020) (quoting *Greenidge*, 446 F.3d at 361).

In the Complaint, Plaintiff brings retaliation claims under Title VII, § 1983, and the NYSHRL. (Dkt. No. 6, at 13–16). The Complaint refers to Plaintiff's filing grievances in July

2016, regarding Tripp's signing of her leave form, and in October 2016, regarding her demotion, and to a December 15, 2016 "Union meeting" where Plaintiff "vented about her frustrations, being discriminated and retaliated against, and treated unfairly. (*Id.* ¶¶ 12, 23, 28). The Complaint contains no reference to a December 15, 2016 meeting with Mayor Butterfield and her union representative regarding her demotion. In his interrogatories, DeGirolamo asked Plaintiff to "[s]tate with specificity all the facts that Plaintiff bases her retaliation claim on . . . for her opposition to discrimination . . . including the elate, location, and manner of Plaintiffs engagement in protected activity to support her claim of retaliation." (Dkt. No. 65-12, at 3). Plaintiff responded citing, as protected activity, her July and October 2016 grievances and "comments Plaintiff made at a December 15, 2016 Union meeting regarding the discrimination she had faced." (Dkt. No. 65-12, at 4; *see also* Dkt. No. 65-11, at 3–4 (Plaintiff's identical response to Tripp interrogatory); Dkt. No. 65-10, at 3–4 (Plaintiff's identical response to Chief Crowell's interrogatory)). At her deposition, Plaintiff testified that she had conversations with Mayor Butterfield "multiple times" "[d]uring the whole couple years" "[r]egarding some of the charges and allegations . . . and asked him to listen to my side," and that they spoke about Plaintiff's "leadership and he knew [she] had a high rank in the military." (Dkt. No. 65-16, at 31–32). Plaintiff stated that a union member was "always present during these conversations" but made no reference to a December 15, 2016 meeting with the Mayor or that she complained to him about discrimination. (*Id.* at 32). It is not until her affirmation, in response to Defendants' motion for summary judgment, that Plaintiff recounts her December 15, 2016, meeting with Mayor Butterfield. (Dkt. No. 71-2). In it, she asserts that she and her union representative met with Mayor Butterfield about her demotion, and that she told the Mayor: "I am a well respected female officer in the military" and that "most of my colleagues in the military are men and that I

59

have excelled in that male dominated environment without incident," and that "every time I turn around I can't win." (Dkt. No. 71-2, ¶ 60). And in response to Mayor Butterfield's comment that Chief Crowell had advised him that Plaintiff "lack[ed] leadership abilities," Plaintiff "offered to show him [her] stellar military evaluations." (*Id.*).

As the Complaint gave Defendants no notice that Plaintiff intended to assert a retaliation claim based on a complaint of discrimination to Mayor Butterfield, Plaintiff asserted this theory of protected activity for the first time in response to Defendants' motion for summary judgment, and Plaintiff has not sought leave to amend the Complaint, "it would be improper to consider [this claim] at the summary judgment stage." *Knutson*, 2020 WL 2765771, at *3, 2020 U.S. Dist. LEXIS 93346, at *8; *see also Greenidge*, 446 F.3d at 361 ("[A] district court does not abuse its discretion when it fails to grant leave to amend a complaint without being asked to do so."); *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701–02 (2d Cir. 2010) (concluding the district court did not abuse "its discretion in failing to consider plaintiff's new theories of liability where complaint and interrogatory response were insufficient to put defendant on notice of plaintiff's new negligence claims"). Accordingly, the Court considers Plaintiff's retaliation claims based on her alleged protected activity of filing grievances and speaking at a December 15, 2016 union meeting.

### 2.   Original Claims of Protected Activity

Title VII, § 1983, and NYSHRL retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 74 (2d Cir. 2015); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012); *see also Vega*, 801 F.3d at 91 ("As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII.").

If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013). If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by a retaliatory motive. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

To establish a prima facie case of retaliation, a plaintiff must show that she (1) engaged in protected activity, (2) that the defendant was aware of the activity and (3) took an adverse employment action against the plaintiff, and (4) that there is a causal connection between the protected activity and the adverse employment action. *Summa*, 708 F.3d at 125.

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Further, "opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection." *Id.* Instead, "'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). "'[I]mplicit in the requirement that the employer [was] aware of the protected activity is the requirement that the [employer] understood, or could have reasonably understood,' that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by Title VII." *Rosioreanu v. City of New York*, 526 F. App'x 118, 120 (2d Cir. 2013) (quoting *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

In the July 18, 2016 grievance, Plaintiff alleged that Tripp, who was junior to Plaintiff, violated the CBA and the NSPD general orders by signing her time off slip, which should have been signed by Chief Crowell. (Dkt. No. 65-79, at 2). Plaintiff asked that the CBA and the NSPD general orders be followed and that "all time off slips be submitted directly to the Chief of Police for the rank of Sergeant and approved by same." (*Id.*). In the October 6, 2016 grievance, Plaintiff alleged:

> The Employer has violated the Agreement by failing to meet it's [sic] just cause burden as specified in Article 15. Moreover, the Employer has failed to follow the progressive discipline procedure of Article 15. In addition, the Employer is attempting to impose a level of discipline that does not exist in the collective bargaining agreement nor have the parties ever negotiated . . . a provision for the demotion of bargaining unit employees.

(Dkt. No. 65-80, at 2). At the December 15, 2016 Union meeting, "discussion turned to Sergeant Tripp's treatment of other employees" and NSPD Clerk Mary Renna asked "no one wants to bring up our favorite Sergeant and his abusive behavior?" (Dkt. No. 71-2, ¶ 47). Plaintiff responded that she "could shoot him because of his aggressive behavior." (Dkt. No. 65-16, at 154; Dkt. No. 71-2, ¶ 47).

Plaintiff's grievances and her complaint about Tripp's abusive or aggressive behavior contain no reference to gender-based conduct prohibited by Title VII or the Equal Protection Clause. "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009) ("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity."). Accordingly, in the absence of evidence that Plaintiff complained of

treatment due to membership in a protected class, Defendants are entitled to summary judgment

as a matter of law. *See Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 406–07

(S.D.N.Y. 2010) (granting summary judgment on retaliation claim where the plaintiff "never

mentioned racial discrimination" to human resources and failed to meet "his burden of showing

that his complaints . . . were complaints of unfair treatment due to his membership in a protected

class").

> ### D.     Hostile Work Environment

Defendants seek summary judgment dismissing Plaintiff's hostile work environment

claim. (Dkt. No. 65-94, at 32–36). Plaintiff opposes this motion. (Dkt. No. 71-8, at 14–19). To

establish a hostile work environment claim under Title VII, a plaintiff must demonstrate

harassment on the basis of his or her sex, 42 U.S.C. § 2000e-2(a), and "that his or her workplace

was 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms

and conditions of [his or] her employment were thereby altered.'" *Agosto v. New York City Dep't

of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (quoting *Desardouin v. City of Rochester*, 708 F.3d

102, 105 (2d Cir. 2013)); *see also Legg v. Ulster Cty.*, 979 F.3d 101, 116 (2d Cir. 2020) ("The

threshold standard for proving a hostile work environment claim is generally the same for both

Title VII and § 1983."); *Tolbert*, 790 F.3d at 439 ("Hostile work environment claims under Title

VII and the NYSHRL are governed by the same standard.").The hostile work environment

standard "includes both objective and subjective components: the conduct complained of must be

severe or pervasive enough that a reasonable person would find it hostile or abusive, and the

victim must subjectively perceive the work environment to be abusive." *Rasparado v. Carlone*,

770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts

examine the case-specific circumstances in their totality and evaluate the severity, frequency, and

degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014)

(quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). The court may also consider "whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). To survive summary judgment on a hostile work environment claim, "[t]he incidents typically 'must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Agosto*, 982 F.3d at 102 (quoting *Alfano*, 294 F.3d at 374).

Title VII does not impose "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). "Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim." *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (internal quotation marks omitted); *accord Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (noting that "sporadic, isolated incidents of boorish or offensive use of language are insufficient to establish a hostile work environment" (internal quotation marks omitted)). Further, "[i]ncidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation marks omitted).

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001). But if no reasonable

jury could conclude, considering all the circumstances, that "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*," *Schiano*, 445 F.3d at 600 (quoting *Whidbee*, 223 F.3d at 70 (2d Cir. 2000)), a court may conclude as a matter of law that the work environment is not sufficiently hostile to violate Title VII.

To begin, Plaintiff's claim regarding mentorship, is, as discussed, too vague to allow an inference of disparate treatment based on gender and the Court has omitted it from the analysis here. The remaining alleged incidents, however, which stem principally from DeGirolamo's conduct and Chief Crowell's toleration of it, including the use of offensive language that is disparaging to women and using the bathroom in a manner to make it unsanitary for a woman to use, as well as Chief Crowell's reference to Plaintiff as "she" or "her" allow an inference of gender-based conduct.

### 1.       Objective – Severe or Pervasive

Plaintiff provided evidence of the following treatment and conduct while working at the NSPD: Viewed in the light most favorable to Plaintiff, the evidence supporting Plaintiff's hostile work environment claim suggests a pattern of gender-based harassment and hostility perpetrated by DeGirolamo and, at times, tolerated by Chief Crowell, in which (1) DeGirolamo, "on numerous occasions," referred to Ashley Smith, the only other female officer at the NSPD as "'bitch' and 'cunt,'" (Dkt. No. 71-2, ¶ 57); (2) DeGirolamo referred to women generally as "'bitches,' 'broads,' and 'cunts'" in Plaintiff's presence and the presence of other officers, during her time as a sergeant (pre-September 2016) and when she was returned to officer status (September 2016 to June 2017), (*id.*); (3) Chief Crowell on occasion laughed at DeGirolamo's disparaging remarks, (*id.*); (4) DeGirolamo ignored Plaintiff's instruction to stop using the offensive language despite being her subordinate; (5) Chief Crowell refused to intervene or

admonish DeGirolamo despite witnessing him ignore Plaintiff's instruction, (*id.*); (6) DeGirolamo persistently asked Plaintiff about her sexual activities even after she told him it was "none of his business," (*id.* ¶ 58); (7) despite Plaintiff's repeated requests to close the bathroom door, DeGirolamo "peed with the door open plenty of times," (Dkt. No. 65-19, at 80); (8) beginning in or about July 2016, Chief Crowell referred to Plaintiff as "she" or "her" rather than by her name or rank, (Dkt. No. 71-2, ¶ 43), (9) on or about December 22, 2016, Sergeant DeGirolamo rejected a memorandum Plaintiff had prepared at his direction and "screamed at [Plaintiff] at the top of his lungs and told [her] to write another memorandum recounting turn-by-turn where [she] had gone" and that she "was not allowed to leave until [she] had done so," (*id.* ¶ 51); (10) in May and June 2017, Sergeant DeGirolamo began leaving "the toilet seat down" in the unisex bathroom and left "drops of urine on the seat" "when [Plaintiff] needed to use it," (*id.* ¶ 55); and (11) after Plaintiff was reinstated to Sergeant in June 2017, her name was never returned to her door, her title was not reinstated in the computer system, she was required to handle calls normally handled by junior officers and she was often left to respond on patrol alone, (*id.* ¶ 43; Dkt. No. 71-3, ¶ 14).

None of the above-listed incidents, considered in isolation, possess characteristics that would allow a factfinder to conclude it was so "severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment.'" *Pucino*, 618 F.3d at 119 (2d Cir. 2010) (quoting *Harris*, 510 U.S. at 21). Viewed cumulatively and in the light most favorable to Plaintiff, however, the alleged use of the derogatory gender-based words "on numerous occasions" to refer to one of the two female officers at the NSPD and women generally, the tolerance and tacit approval of this conduct by Chief Crowell, together with DeGirolamo's persistent questions about Plaintiff's sexual activities, screaming at her "at the top

of his lungs" regarding her preparation of a memorandum,[25] DeGirolamo's use of the unisex

bathroom with the door open, and leaving urine on the toilet seat knowing women used the same

bathroom, and Chief Crowell's reference to Plaintiff as "she" or "her" while referring to her male

colleagues by the names or rank, may constitute "a steady barrage of opprobrious" conduct

demeaning to women sufficiently pervasive to create a hostile work environment. *Delgado v.

City of Stamford*, No. 11-cv-01735, 2015 WL 6675534, at *26, 2015 U.S. Dist. LEXIS 148038,

at *81 (D. Conn. Nov. 2, 2015) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.

1997)). Indeed, "the pervasiveness determination is 'the sort of issue that is often not susceptible

of summary resolution.'" *Id.*, 2015 U.S. Dist. LEXIS 148038, at *81 (quoting *DiLaurenzio v.

Atlantic Paratrans, Inc.*, 926 F. Supp. 310, 314 (E.D.N.Y. 1996)); *see also id.*, 2015 U.S. Dist.

LEXIS 148038, at *81–82 (finding "[a] reasonable jury could conclude that" officers' alleged

constant use of the terms "spic," "guat" and "taco guy" to refer to Hispanic persons "and

comments regarding Hispanics being drunk and having illegal kids, constituted a steady barrage

of opprobrious comments demeaning to Hispanics" and that there was a material issue of fact as

to whether "these remarks, taken cumulatively with the alleged use of the words 'pussy,' 'tits,'

and 'cunt,' obscene sexual jokes and stories, and references to penis size, were . . . sufficiently

pervasive to create a hostile work environment"); *Marshall v. Kingsborough Cmty. Coll. of

Cuny*, No. 11-cv-2686, 2015 WL 5773748, at *11, 2015 U.S. Dist. LEXIS 134256, at 34–36

(E.D.N.Y. July 27, 2015) (concluding that given the "the inflammatory and clearly gender-based

---

[25] Although this is a facially sex-neutral incident, Second Circuit case law is clear "that when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020) (citing, inter alia, *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010) ("Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not." (citation and internal quotation marks omitted)).

nature" of the department chair's references to plaintiff and "other female employees as 'cunts' and 'bitches' and statement that 'women don't belong in the work place'" together with chair's conduct of "weekly 'g[etting] in the face' of female colleagues in a physically intimidating manner," "a reasonable jury could conclude that the weekly or even twice-monthly slurs were sufficient to create a hostile work environment"), *report and recommendation adopted in relevant part*, 2015 WL 5774269, 2015 U.S. Dist. LEXIS 133298 (E.D.N.Y. Sept. 30, 2015).

### 2.    Subjective Experience

In addition, Plaintiff has presented evidence that she subjectively experienced a hostile work environment. She testified that she "felt like [she] was going to throw up oftentimes going to work" and she knew it was the stress and "abuse[]" she was experiencing at work that was causing her to feel ill. (Dkt. No. 65-16, at 186, 188). *See Feingold*, 366 F.3d at 151 (finding the plaintiff raised a material issue of fact regarding whether he "subjectively experienced a hostile work environment" where he stated "in his affidavit that the hostile treatment took a psychological toll on him, causing him to become depressed, to dread going to work, to seek a transfer, and to lose his desire to socialize with people in general).

### 3.    Basis for Imputation to NSPD

A plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001). Defendants argue that even if Plaintiff raises a material issue of fact as to her hostile work environment claim, they cannot be held liable because she failed "to utilize the internal reporting mechanisms to report the alleged harassing behavior of a co-worker." (Dkt. No. 65-94, at 36). Plaintiff responds that "the discriminatory conduct was either committed by the Chief himself or was witnessed by him" and that as Chief his action and inaction may be imputed to the Defendant Village. (Dkt. No. 71-8, at 18–19).

The standard for imposing liability on an employer for workplace harassment by employees depends on the status of the harasser:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

*Vance*, 570 U.S. at 424 (2013) (citations omitted) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher*, 524 U.S. at 807). In *Vance*, the Supreme Court further held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

To establish an employer's negligence in controlling workplace conditions, a plaintiff must demonstrate that his employer: (i) "failed to provide a reasonable avenue for complaint"; or (ii) "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)); *accord Vance*, 570 U.S. at 449 (noting that a plaintiff could show that his "employer was negligent in failing to prevent harassment from taking place" with, inter alia, "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering

complaints, or effectively discouraged complaints from being filed"). The second avenue of vicarious liability (knowledge and failure to act) "requires a plaintiff to show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F.3d at 763.

Although DeGirolamo is alleged to be responsible for bulk of the alleged harassing conduct, Plaintiff presents evidence that Chief Crowell witnessed DeGirolamo's conduct on a number of occasions, as well as Plaintiff's efforts to stop DeGirolamo, but failed to respond, and, on occasion, laughed at and tacitly condoned DeGirolamo's disparaging remarks. There is also evidence that, as a supervisor, Chief Crowell was charged with acting on any complaint alleging workplace harassment, including "offensive, or demeaning comments or slurs, ridicule, [and] offensive language." (Dkt. No. 65-75, at 3–4). Accordingly, the Court concludes Plaintiff has raised a material issue of fact as to the Village's liability under Title VII and the NYSHRL.[26]

### 4.   Aiding and Abetting Hostile Work Environment - NYSHRL

Defendants argue there is no basis "to hold the individual Defendants liable under a theory of aiding and abetting" under the NYSHRL. (Dkt. No. 76, at 21). Here, there is evidence that would allow a factfinder to conclude that DeGirolamo and Chief Crowell "actually participate[d]" in creating the hostile work environment. *Feingold*, 366 F.3d at 158 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)). There is no evidence, however, of Tripp's involvement in the creation of the hostile work environment. Accordingly, DeGirolamo

---

[26] Having concluded that Plaintiff failed to raise a material issue of fact showing she engaged in protected activity for purposes of her retaliation claim, to the extent Plaintiff brings a retaliatory hostile work environment claim, (Dkt. No. 6, ¶¶ 49, 58), Defendants are entitled to summary judgment dismissing that claim.

and Chief Crowell are denied summary judgment on Plaintiff's NYSHRL hostile work environment claim and Tripp is granted summary judgment.[27]

### E.     First Amendment Retaliation

Defendants moved for summary judgment dismissing Plaintiff's First Amendment retaliation claim on the basis that her speech—the July and October 2016 grievances, and her comments regarding Tripp at the December 15, 2016 union meeting—is not protected by the First Amendment. (Dkt. No. 65-94, at 40). In response, Plaintiff argues, as she did with her Title VII retaliation claim, by asserting, for the first time, that her December 15, 2016 conversation with Mayor Butterfield regarding her demotion was her protected speech. (Dkt. No. 71-8, at 22). Plaintiff does not respond to Defendants' arguments regarding her grievances and comments at the union meeting. Defendants reply that this "protected activity" is a newly-raised claim and ask that the Court reject it. (Dkt. No. 76, at 25). The Court agrees. For the reasons it articulated *supra* Section IV.C.1., the Court declines to consider Plaintiff's newly-asserted theory of First Amendment retaliation. Accordingly, the Court turns to Defendants' arguments that Plaintiff's grievances and comments at the union meeting do not constitute protected speech.

The Second Circuit has noted that to survive summary judgment on this claim, "a public employee must establish a prima facie case by bringing forth evidence showing that (1) [s]he has engaged in protected First Amendment activity, (2) [s]he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment

---

[27] The parties have not addressed Plaintiff's § 1983 hostile work environment claim or the individual Defendants' personal involvement and given Chief Crowell and DeGirolamo's involvement in the alleged conduct, the Court concludes Defendants have failed to show they are entitled to summary judgment dismissing the § 1983 hostile work environment claims against them. As there is no evidence, however, of Tripp's involvement, summary judgment dismissing the § 1983 hostile work environment claim against him is granted.

action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quoting *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (internal quotation and alterations omitted)).

As a public employee, Plaintiff may satisfy the first element by establishing that she "'spoke as a private citizen and . . . the speech at issue addressed a matter of public concern'— that is, the speech must be 'fairly considered as relating to any matter of political, social, or other concern to the community' and be of 'general interest' or of legitimate news interest.'" *Agosto*, 982 F.3d at 95 (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 393, 399 (2d Cir. 2018) (internal quotation marks omitted). "For public employees, speech that 'principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance— does not qualify for First Amendment protection.'" *Id.* (quoting *Montero*, 890 F.3d at 399–400). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008).

Even assuming Plaintiff spoke as a private citizen when filing her grievances and speaking at the union meeting, Plaintiff has failed to present evidence that any of her three "'categories' of speech addressed a matter of public concern." *Agosto*, 982 F.3d at 96 (quoting *Montero*, 890 F.3d at 394). The form of Plaintiff's first two categories of speech, Plaintiff's July 2016 internal union grievance regarding Tripp's signing, as an inferior officer, of her leave slip, concerned the alleged violation of the NSPD General Orders and the CBA, and October 2016 grievance regarding her demotion, (Dkt. No. 65-79, at 2; Dkt. No. 65-80, at 2), "suggest[]the absence of a matter of public concern." *Agosto*, 982 F.3d at 95. As the Supreme Court has explained: "A petition filed with an employer using an internal grievance procedure in many

cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398 (2011). Examination of the subject of Plaintiff's grievances reveals that Plaintiff was prompted by her objection to Tripp's signing her leave slip on the ground that he was her junior in seniority and concern that she was being demoted without just cause and subjected to a disciplinary action not provided for in the CBA. Plaintiff has not identified a more "substantial interest" in seeking to redress these otherwise personal grievances, thus, she fails to raise a material issue of fact that would allow an inference that she engaged in speech on a matter of public concern. *Agosto*, 982 F.3d at 95; *see also Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (explaining that a consideration of "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose" is relevant to determining whether speech addresses a matter of public concern. (quoting *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999)).

The subject of Plaintiff's speech at the December 15, 2016 union meeting that she could shoot Tripp "because of his aggressive behavior," (Dkt. No. 65-16, at 154; Dkt. No. 71-2, ¶ 47), does not allow an inference that Plaintiff was speaking on a subject that implicated a public concern. *See Montero*, 890 F.3d at 400 ("The district court did not err when it found that Montero's criticism of Olson's union leadership [at union meeting] reflected a personal rivalry between two union leaders, and concluded that it thus plainly do[es] not implicate a public concern.") (internal quotation marks omitted); *see also Alexander v. City of New York*, No. 02-cv-3555, 2004 WL 1907432, at *14, 2004 U.S. Dist. LEXIS 17042, at *41 (S.D.N.Y. Aug. 25, 2004) ("While the complaints did allege discrimination, they made no mention of systemic, pervasive misconduct [within the Nassau County Police Department]; rather, they pertained only

to particular individual incidents pertaining to plaintiff[s].")." Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's First Amendment retaliation claim.

### F.    Qualified Immunity

The individual Defendants argue they are entitled to qualified immunity because their actions "were clearly legitimate and Defendants provided ample non-discriminatory and non-retaliatory reasons for their actions towards Plaintiff and her employment." (Dkt. No. 65-94, at 45). Plaintiffs counter that that given the evidence demonstrating Defendants intentionally discriminated against Plaintiff, qualified immunity cannot be decided at this stage. (Dkt. No. 71-8, at 24). The Court agrees—because factual issues remain that bear on the qualified immunity analysis, qualified immunity is precluded at this stage. *Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)); *see also Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

At the summary judgment stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) 'whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right' and (2) 'whether the right in question was clearly established at the time of the violation.'" *Sloley v. Vanbramer*, 945 F.3d 30, 36 (2d Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide which of the two prongs to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under either prong of the qualified immunity analysis, the

Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656. Qualified immunity "is an affirmative defense on which [Defendants have] the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018).

The Court does not consider whether Defendants are entitled to qualified immunity for Plaintiff's equal protection discrimination claims claim because Defendants have failed to offer any specific factual analysis showing why they are entitled to qualified immunity and have not replied to Plaintiff's arguments in opposition. (*See generally* Dkt. No. 76). Given that qualified immunity is an affirmative defense, the Court finds that Defendants have not carried their burden. *See McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) ("The qualified immunity defense can be waived, either by failure to raise it in a timely fashion, or by failure to raise it with sufficient particularity.").

### G.      Municipal Liability

Defendants seek summary judgment dismissing Plaintiff's § 1983 municipal liability claim against the Village, arguing that Plaintiff has adduced no evidence of a "pervasive and widespread custom or practice within the Village." (Dkt. No. 65-94, at 42–43). Plaintiff opposes dismissal arguing, without any citation to the record: "[t]here is sufficient evidence to create a triable issue of fact on Plaintiff's claim of an Unlawful custom/Policy and/or Practice of Discrimination." (Dkt. No. 71-8, at 22).

"For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694. "To

hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). As the Second Circuit has explained: "[A] municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*," but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Id.* (first quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); then quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (alterations in original).

Here, the Court has found questions of fact preclude summary judgment regarding whether Chief Crowell was personally involved in the violation of Plaintiff's equal protection rights by subjecting her to gender discrimination and a hostile work environment at the NSPD. In addition, there is evidence in the record that Chief Crowell had the authority to summarily demote Plaintiff and cause the revocation of her police certification and that he was responsible for the conduct of, and interaction between, the officers at the NSPD. A policymaker is one who is "responsible for establishing final government policy respecting [the relevant category of] activity." *Pembaur*, 475 U.S. at 482–83. The parties have not addressed whether Chief Crowell was a final policymaker for purposes of municipal liability. *See Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (explaining that for municipal liability to attach, final policymaker must have "final policymaking authority *in the particular area involved*") (emphasis added). Thus, the Court concludes Defendants have not established the absence of a genuine issue of material fact with respect to whether Chief Crowell was a final policymaker for purposes of municipal

liability with respect to Plaintiff's equal protection gender discrimination and hostile work environment claims. *See, e.g.*, *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 521 (E.D.N.Y. 2011) (finding "sufficient evidence . . . to defeat summary judgment under the 'final policymaker' theory of municipal liability," with respect to First Amendment retaliation claim where the plaintiff "set forth evidence that the Chief of Police and the Village Board directly participated in the disciplinary investigation and charging decision relating to plaintiff' (citing *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003) ("Here, plaintiff challenges as retaliatory employment decisions made by [the defendant], who, as the Suffolk County police commissioner, had authority to set department-wide personnel policies. [The defendant's] position provides a sufficient basis for holding the County liable for his adverse decisions with respect to plaintiff.")). Accordingly, Defendants are not entitled to summary judgment dismissing Plaintiff's municipal liability claim.[28]

## H.    Breach of Contract

In their opening memorandum, Defendants seek dismissal of Plaintiff's breach of contract claim on the basis that where there is a collective bargaining agreement, a plaintiff may only sue her employer for breach of contract when the union fails in its duty of fair representation. (Dkt. No. 65-94, at 46 (citing *Lore v. City of Syracuse*, 670 F.3d 127, 151 (2d Cir. 2012)). Plaintiff opposes dismissal of her breach of contract claim, asserting, for the first time in this litigation, that Defendants violated a contract separate and apart from the CBA, namely, the June 12, 2017 settlement agreement restoring her rank to sergeant. (Dkt. No. 71-8, at 24). Defendants reply that "at no point in this litigation has Plaintiff asserted a breach of contract

---

[28] Defendants' request for summary judgment dismissing, on grounds of duplicity, the official capacity claims against Defendants Crowell, Tripp, and DeGirolamo, however, is granted. (Dkt. No. 65-94, at 43–44).

claim based on the Settlement Agreement," and argue that it is improper to raise a new claim in response to a motion for summary judgment and that the Court should decline to consider it. (Dkt. No. 76, at 29). The Court agrees.

As discussed above, Courts have repeatedly held that it is improper to consider claims not asserted in the complaint and raised for the first time at the summary judgment stage. *See supra* Section IV.C.1. In her Complaint, citing the CBA, Plaintiff alleges that Defendants "have discriminated against the Plaintiff and subjected her to unequal treatment and discipline without just cause, and /or on account of her gender . . . constituting breach of contract." (Dkt. No. 6, ¶ 75). Nowhere in her responses to Defendants' interrogatories does she reference such a claim. (*See* Dkt. Nos. 65-9 to -12). Nor has Plaintiff requested to amend or supplement her Complaint to add this claim. As the Complaint gave Defendants no notice that Plaintiff intended to assert a breach of contract claim based on the settlement agreement, and Plaintiff raised it for the first time in response to Defendants' motion for summary judgment and has not sought leave to amend the Complaint, "it would be improper to consider [this claim] at the summary judgment stage." *Knutson*, 2020 WL 2765771, at *3, 2020 U.S. Dist. LEXIS 93346, at *8; *see Greenidge*, 446 F.3d at 361 ("[A] district court does not abuse its discretion when it fails to grant leave to amend a complaint without being asked to do so."); *see Lyman*, 364 F. App'x at 701–02 (concluding the district court did not abuse "its discretion in failing to consider plaintiff's new theories of liability where complaint and interrogatory response "they were insufficient to put defendant on notice of plaintiff's new negligence claims"). Accordingly, the Court declines to consider Plaintiff's newly raised breach of contract claim based on the settlement agreement and considers only Plaintiff's original claim.

Plaintiff alleges that the CBA "requires good faith and fair dealing, bars the imposition of discipline without just cause, compels the employer to provide due process, and provides . . . that Plaintiff's rights to compensation and benefits will not be diminished or compromised" and that Defendants have discriminated against her and subjected her to unequal treatment and discipline without just cause and "on account of her gender," in breach of the CBA. (Dkt. No. 6, ¶ 74). As Defendants correctly observe, an employee subject to a collective bargaining agreement that creates a grievance procedure, "may not sue the employer directly for breach of that agreement, but must proceed, through the union, in accordance with that contract." *Lore*, 670 F.3d at 151 (quoting *Board of Educ. v. Ambach*, 70 N.Y.2d 501, 508 (1987)). "So long as 'the discrete fair representation question still needs to be litigated,' there can be no resolution on the employee's breach-of-contract claim against the employer." *Id.* (quoting *Matter of Obot*, 89 N.Y.2d 883, 886 n.* (1996)). Here, it is undisputed that the CBA provides a grievance procedure and that Plaintiff has not filed a claim against the Union for breaching its duty of fair representation. Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's breach of contract claim. *Lore*, 670 F.3d at 151 (dismissing the plaintiff's breach-of-contract claim against the defendant city as a matter of law as "[n]o claim against the union was asserted by Lore in this case").

## I.      Defamation and Tortious Interference

Defendants move for summary judgment dismissing Plaintiff's two common law tort claims, defamation and tortious interference, against Defendant Crowell on the ground that she failed to serve a Notice of Claim as required by New York Municipal Law § 50-h. (Dkt. No. 65-94, at 47–49). Plaintiff argues that she was not required to serve a Notice of Claim because the Complaint alleges Chief Crowell committed intentional torts outside the scope of his employment. (Dkt. No. 71-8, at 26). Plaintiff's argument is without merit.

"Under New York law, a notice of claim is a mandatory precondition to bringing a tort claim against a municipality or any of its officers, agents or employees." *Alexander v. City of Syracuse*, No. 17-cv-1195, 2018 WL 6591426, at *4, 2018 U.S. Dist. LEXIS 210687, at *11 (N.D.N.Y. Dec. 13, 2018) (quoting *Grant v. City of Syracuse*, No. 15-cv-445, 2017 WL 5564605, at *10, 2017 U.S. Dist. LEXIS 190763, at *24 (N.D.N.Y. Nov. 17, 2017)). "[D]istrict courts in this circuit have routinely applied the notice-of-claim requirement to defamation claims." *Poole v. Hawkins*, No. 18-cv-443, 2021 WL 695119, at *9–10, 2021 U.S. Dist. LEXIS 33246, at *22–23 (E.D.N.Y. Feb. 23, 2021) (citing *Domni v. County of Nassau*, No. 19-cv-83, 2020 WL 7625417, at *6, 2020 U.S. Dist. LEXIS 240086, at *15–16 (E.D.N.Y. Dec. 21, 2020)); This requirement is likewise applicable to Plaintiff's tortious interference claim. *Pilitz v. Inc. Vill. of Rockville Ctr.*, No. 07-cv-4078, 2008 WL 4326996, at *8, 2008 U.S. Dist. LEXIS 72231, *23 (E.D.N.Y. Sept. 22, 2008) ("Plaintiff's claims of tortious interference and negligent supervision fall within the definition of 'tort' claims to which the notice of claim provision applies."). Further, as both the defamation and tortious interference claims stem from Chief Crowell's completion of the Police Registry form as required by the New York Executive Law § 845, the Court has no difficulty concluding his actions fell within the scope of his employment. *See Turner v. Dellapia*, No. 18-cv-1973, 2020 WL 6482880, at *10, 2020 U.S. Dist. LEXIS 206166, at *28 (S.D.N.Y. Nov. 3, 2020) ("There is no allegation that the County Defendants were acting outside the scope of their employment when they searched Plaintiff's apartment, such that they would not be entitled to indemnification by the County and (therefore) the procedural protections of section 50-e."); *Rivera v. City of New York*, 392 F. Supp. 2d 644, 658 (S.D.N.Y. 2005) ("Rivera's failure to identify the tortious interference on his Notice of Claim is

also fatal to his tortious interference claim as against the City."). Accordingly, Plaintiff's

defamation and tortious interference claims are dismissed without prejudice.

### J.    New York Constitution

Defendants seek summary judgment dismissing Plaintiff's claim that they violated

Article 1, §§ 8 and 11 of the New York State Constitution on the ground that no private right of

action exists under the circumstances of this case. (Dkt. No. 65-94, at 55). Plaintiff has not

opposed dismissal of this claim. Courts in this Circuit have dismissed claims "for violations of

the New York State Constitution where the plaintiff has an alternative remedy [under common

law or § 1983] for violations of parallel provisions of the U.S. Constitution." *Alwan v. City of

New York*, 311 F. Supp. 3d 570, 586 (E.D.N.Y. 2018) (citing *Allen v. Antal*, 665 F. App'x 9, 13

(2d Cir. 2016)); *see Azurdia v. City of New York*, No. 18-cv-04189, 2019 WL 1406647, at *15,

2019 U.S. Dist. LEXIS 52967, at * 46–47 (E.D.N.Y. Mar. 28, 2019) (dismissing claims the

plaintiffs brought under the New York Constitution as the plaintiffs had adequate alternative

remedies). Here, there is no argument that Plaintiff lacks adequate alternative remedies.

Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's claims under

the New York State Constitution.

### K.    Punitive Damages

Defendants seek dismissal of Plaintiff's punitive damages claim. (Dkt. No. 65-94, at 56).

The Court declines to dismiss Plaintiff's punitive damages claim at this stage.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 65) is

**GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's retaliation claims under Title VII, § 1983, NYSHRL and the First Amendment; and Plaintiff's claims for breach of contract, defamation, tortious interference, and violations of the New York State Constitution claims are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's § 1983 and NYSHRL gender discrimination claims against Defendants Tripp and DeGirolamo are **DISMISSED**; and it is further

**ORDERED** that all official capacity claims against Defendants Crowell, Tripp, and DeGirolamo are **DISMISSED** as duplicative; and it is further

**ORDERED** that Defendant Tripp is **DISMISSED** as a Defendant and the Clerk is respectfully requested to terminate Tripp as a Defendant; and it is further

**ORDERED** that all of the Plaintiff's claims against Defendant NSPD are **DISMISSED**, and the Clerk is respectfully requested to terminate the NSPD as a Defendant.

**IT IS SO ORDERED.**

Dated: March 12, 2021
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge